1  Mary Frudden
   Nevada State Bar No. 3973
2  Jon E. Frudden
   1902 Carter Dr.
3  Reno, NV 89509
   775-324-7078
4

5  *Pro Se* On Behalf of Themselves and their Minor Children

6

7

8

9

10  MARY FRUDDEN, et al.          Case No. 3:11-cv-00474-RCJ-VPC

11          Plaintiffs,

12  v.                            **PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
                                  **MOTION TO DISMISS PLAINTIFFS' FIRST**
13  KAYANN PILLING, et al.        **AMENDED COMPLAINT**

14  _____/

15          Plaintiffs, MARY FRUDDEN and JON E. FRUDDEN, individually and as parents and

16  guardians of their minor children JOHN and JANE DOE, hereby file their Opposition to

17  Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint.  This Opposition is made

18  and based upon the Memorandum of Points and Authorities attached hereto, the documents on

19  file herein, and any other matter the Court deems necessary and pertinent to this Opposition.

20          DATED: November 23, 2011.

21

22          By: _____
            MARY FRUDDEN, ESQ.
23          Nevada State Bar No. 3973
            and JON E. FRUDDEN
24          *Pro Se*
            1902 Carter Dr.
25          Reno, NV 89501
            Telephone: 775-324-7078
26          maryfrudden@sbcglobal.net

27          On Behalf of Themselves and their Minor Children

28

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

1 **MEMORANDUM OF POINTS AND AUTHORITIES**

2 **I.    INTRODUCTION**

3 Nearly 70 years ago, our United States Supreme Court wrote:

4 Struggles to coerce uniformity of sentiment in support of
some end thought essential to their time and country have been
5 waged by many good as well as by evil men. Nationalism is a
relatively recent phenomenon but at other times and places the ends
6 have been racial or territorial security, support of a dynasty or
regime, and particular plans for saving souls. As first and moderate
7 methods to attain unity have failed, those bent on its
accomplishment must resort to an ever-increasing severity.

8 As governmental pressure toward unity becomes greater, so
strife becomes more bitter as to whose unity it shall be. Probably no
9 deeper division of our people could proceed from any provocation
than from finding it necessary to choose what doctrine and whose
10 program public educational officials shall compel youth to unite in
embracing. Ultimate futility of such attempts to compel coherence
11 is the lesson of every such effort from the Roman drive to stamp
out Christianity as a disturber of its pagan unity, the Inquisition, as
12 a means to religious and dynastic unity, the Siberian exiles as a
means to Russian unity, down to the fast failing efforts of our
13 present totalitarian enemies. Those who begin coercive elimination
of dissent soon find themselves exterminating dissenters.
14 Compulsory unification of opinion achieves only the unanimity of
the graveyard.

15 It seems trite but necessary to say that the First Amendment
to our Constitution was designed to avoid these ends by avoiding
16 these beginnings. There is no mysticism in the American concept of
the State or of the nature or origin of its authority. We set up
17 government by consent of the governed, and the Bill of Rights
denies those in power any legal opportunity to coerce that consent.
18 Authority here is to be controlled by public opinion, not public
opinion by authority.

19 The case is made difficult not because the principles of its
decision are obscure but because the flag involved is our own.
20 Nevertheless, we apply the limitations of the Constitution with no
fear that freedom to be intellectually and spiritually diverse or even
21 contrary will disintegrate the social organization. To believe that
patriotism will not flourish if patriotic ceremonies are voluntary and
22 spontaneous instead of a compulsory routine is to make an
unflattering estimate of the appeal of our institutions to free minds.

23 We can have intellectual individualism and the rich cultural
diversities that we owe to exceptional minds only at the price of
24 occasional eccentricity and abnormal attitudes. When they are so
harmless to others or to the State as those we deal with here, the
25 price is not too great. But freedom to differ is not limited to things
that do not matter much. That would be a mere shadow of freedom.
26 The test of its substance is the right to differ as to things that touch
the heart of the existing order.

27 If there is any fixed star in our constitutional constellation, it
is that no official, high or petty, can prescribe what shall be
28 orthodox in politics, nationalism, religion, or other matters of

1   opinion or force citizens to confess by word or act their faith
    therein. If there are any circumstances which permit an exception,
2   they do not now occur to us. [n.]
            We think the action of the local authorities in compelling the
3   flag salute and pledge transcends constitutional limitations on their
    power and invades the sphere of intellect and spirit which it is the
4   purpose of the First Amendment to our Constitution to reserve
    from all official control.

5

6   *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 640-42, 63 S.Ct. 1178 (1943)

7   **II.    STANDARD**

8           The Federal Rules of Civil Procedure embrace a notice-pleading standard.  Pleadings must

9   be construed so as to do justice.  Fed.R.Civ.P. 8(e).  All that is required to survive a Rule

10  12(b)(6) motion is "a short and plain statement of the claim showing that the pleader is entitled to

11  relief," Fed.R.Civ.P. 8(a)(2), in order to "'give the defendant fair notice of what the ... claim is

12  and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127

13  S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2

14  L.Ed.2d 80 (1957)).  In pleading the grounds of the claim, the plaintiff need not provide "detailed

15  factual allegations," *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955; however, the plaintiff must plead

16  enough facts "to raise a right to relief above the speculative level." *Id*.

17          To survive a motion to dismiss, a complaint must contain sufficient factual matter, which,

18  if accepted as true and construed in the light most favorable to Plaintiff, states a claim to relief

19  that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009).

20  Facial plausibility exists if the pleader pleads factual content that allows the court to draw the

21  reasonable inference that the defendant is liable for the misconduct alleged.  *Id*.

22          Plaintiffs' First Amended Complaint (FAC) provides sufficient, specific facts regarding

23  Defendants' conduct which gives rise to Plaintiffs' claims, which if taken as true, would allow the

24  Court to draw a reasonable inference the Defendants are liable for the misconduct.

25  **II.    ANALYSIS**

26      **A.    FIRST CLAIM FOR RELIEF**

27          Plaintiffs' First Claim asserts Defendants acted outside the scope of their authority and

28  thus their action is void.  FAC, ¶139.  Defendants argue Plaintiffs' First Claim for Relief is not a

1    legally cognizable claim, but rather it is "merely a component of one of the myriad tests that the

2    courts have fashioned over the years in First Amendment jurisprudence." Motion, 5:13-14.

3    Defendants are entirely incorrect in their contention.

4           A claim for relief based upon *ultra vires* acts by government officials is widely recognized

5    by both federal and state courts. "Generally, judicial relief is available to one who has been

6    injured by an act of a government official which is in excess of his express or implied powers."

7    *Harmon, III v. Brucker*, 355 U.S. 579, 78 S.Ct. 433 (1958).[1]

8                      The law is well settled that where a statute is enacted to effect a
                       certain major purpose of public interest within the general control
9                      of a particular public official or Department of Government and
                       such statute authorizes such official to make rules and regulations
10                     to aid in carrying out the purposes of the statute, that such rules
                       and regulations to be valid must be in accordance with the
11                     provisions of the statute, subordinate to its provisions and not in
                       conflict therewith.
12   *United States v. Achabal*, 34 F.Supp. 1, 3 (D. Nev., 1940).

13          Case law makes clear the Court can determine whether Defendants exceeded statutory

14   authority in promulgating the Written Uniform Policy and can enjoin Defendants from acts that

15   are unlawful or in excess of their authority. Plaintiffs' First Claim for Relief sets forth the

16   necessary allegations.

17          Although the Nevada Legislature has made clear maintaining control of education is

18   essentially a matter for local control by local school districts, this is not unlimited power or

19   authority. NRS 385.005. Rather, a school district's inherent right to prescribe and control

20

21          [1]*See also Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468,
     102 L.Ed.2d 493 (1988)("It is axiomatic that an administrative agency's power to promulgate
22   legislative regulations is limited to the authority delegated by Congress."); *Coyt v. Holder*, 593
     F.3d 902 (9th Cir. 2010)(determining whether the Attorney General exceeded statutory authority
23   in promulgating an immigration regulation); *Associated General Contractors of California v. San
     Francisco Unified School Dist.*, 616 F.2d 1381, 1384 (9th Cir. 1980)(upholding District Court's
24   determination that San Francisco Board of Education's affirmative action policy was void because
     Board had no authority to adopt it); *Sagamore Park v. City of Indianapolis*, 885 F.Supp. 1146
25   (S.D. Ind., 1994)(Under authority of the Declaratory Judgment Act, 28 U.S.C §2201,
     moratorium held void on pendent state grounds because action was *ultra vires* where zoning
26   bodies in Indiana are not empowered by state law to enact such moratoria); *Horne v. City of
     Mesquite*, 120 Nev. 700, 100 P.3d 168 (2004)(holding that two initiative ordinances were in
27   conflict with Nevada law and therefore invalid and unenforeceable and thus declining to address
     the claim that both ordinances violate the Nevada and United States Constitutions).
28

1   conduct in the schools is limited by other specific provisions of law. *Id.* The rights and powers

2   granted to school districts' boards of trustees have been limited by other specific provisions of

3   applicable law which, in this case, were entirely disregarded and render the Written Uniform

4   Policy void *ab initio*.

5          First, NRS 386.350 leaves no doubt that the board of trustees may not enforce a policy or

6   rule that is inconsistent with the Constitution or the laws of the State of Nevada. *Clark County*

7   *School Dist. v. Beebe*, 533 P.2d 161, 91 Nev. 165 (Nev., 1975). In this case, Plaintiffs have set

8   forth allegations which, if taken as true, establish the Written Uniform Policy to be unconstitu-

9   tional and in violation of the Nevada Revised Statutes. A mandatory uniform policy which

10  violates the Constitution and the laws of the State of Nevada is void and cannot be enforced.

11         Second, pursuant to NRS 386.365, except where the board finds that an emergency exists,

12  each board of trustees in any county having a population of 100,000 or more, shall give 15 days'

13  notice of its intention to adopt, repeal or amend a policy or regulation of the board concerning

14  pupil discipline. The notice *must include the terms of each proposed policy or regulation, or*

15  *change in a policy or regulation*; interested parties *must be afforded a reasonable opportunity*

16  *to submit data, views or arguments, orally or in writing* and the board of trustees *shall consider*

17  *all written and oral submissions respecting the proposal or change before taking final action*.

18  NRS 386.365. Plaintiffs allege there was no compliance with NRS 386.365 prior to promulgating

19  the Written Uniform Policy at Roy Gomm and the mandates of NRS 386.385 have been

20  circumvented. FAC, ¶¶ 56, 58, 61, 63, 64; 19:25-20:20. The discretionary function exception

21  will not apply when a statute, regulation, or policy specifically prescribes a course of action for an

22  employee to follow. The statutory directive must be adhered. *Berkovitz v. United States*, 486

23  U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531, 536 (1988).

24         Third, NRS 388.070 requires the boards of trustees to maintain all the schools established

25  by them as far as practicable, *with equal rights and privileges*. Again, the facts alleged by

26  Plaintiffs shows this has not been done. FAC, ¶¶ 228-233. Because the Written Uniform Policy is

27  inconsistent with NRS 388.070, it is without authority and void.

28         Fourth, although NRS 392.458 permits the board of trustees to establish a policy that

1   requires students to wear school uniforms where certain prerequisites are met, there has been no

2   compliance with the mandates of that statute.  Neither the board of trustees nor the

3   administrators, principals, teachers and other licensed personnel employed by them established the

4   mandatory uniform policy at Roy Gomm pursuant to NRS 392.458.  Rather, contrary to the

5   express statutory language, the mandatory school uniform policy at Roy Gomm was established

6   by the PFA and Uniform Committee utilizing arbitrary and capricious methods, lacking in

7   adequate safeguards.  FAC, ¶¶38, 39, 48, 49, 51-55, 67, 69, 80, 81, 129, 235 and 302.

8          Plaintiffs acknowledge *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673 [*reh'g*

9   *denied*, 393 U.S. 900] (1968) identifies a four-prong test, the first of which is to determine

10  whether the regulation is within the government's *constitutional* power to enact.  Thus, the first

11  prong of the *O'Brien* test depends necessarily on the powers granted to the government by the

12  state's Constitution.[2]  While such a determination must be made under an *O'Brien* analysis when

13  determining whether a regulation is constitutional, that is far different from determining, as

14  Plaintiffs claim herein, that the Defendants were without statutory power to implement mandatory

15  uniforms and to promulgate the Written Uniform Policy, even assuming *arguendo* there is

16  constitutional power to enact.

17         The validity and enforceability of the Written Uniform Policy as outside the Defendants'

18  statutory power to enact constitutes a separate, legally cognizable claim and Plaintiffs' First

19  Amended Complaint sufficiently sets forth the necessary allegations to establish a claim regarding

20  Defendants' lack of power to enact.  Based upon the points and authorities set forth above and

21  the allegations set forth in Plaintiffs' FAC, Defendants' Motion to Dismiss Plaintiffs' First Claim

22  _____

23         [2]Article 11, Section 2 sets forth the Nevada legislature's constitutional powers as follows:

24                 Uniform system of common schools. The legislature shall provide
                   for a uniform system of common schools, by which a school shall

25                 be established and maintained in each school district at least six
                   months in every year, and any school district which shall allow

26                 instruction of a sectarian character therein may be deprived of its
                   proportion of the interest of the public school fund during such

27                 neglect or infraction, and the legislature may pass such laws as will
                   tend to secure a general attendance of the children in each school

28                 district upon said public schools.

1  for Relief should be denied.

2  **B.  SECOND CLAIM FOR RELIEF**

3  Defendants move to dismiss Plaintiffs' Second Claim for Relief asserting Plaintiffs failed to

4  demonstrate the First Amendment is implicated. Motion, 8:6-21. Defendants' Motion in this

5  regard is without merit. Defendants' not only ignore fundamental principles well-settled by

6  binding precedent, but ignore allegations in Plaintiffs' Complaint, which, if taken as true as this

7  Court is bound to do at this stage, clearly and unequivocally set forth a claim for violation of the

8  Plaintiff students' First Amendment rights.

9  Plaintiffs' FAC sets forth allegations of content and viewpoint discrimination, both in what

10  Defendants prohibit and what they mandate. Thus, contrary to Defendants' position, this case is

11  not governed by *Jacobs v. Clark County School District*, 526 F.3d 419 (9th Cir. 2008) and the

12  mid-scrutiny level established in *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673

13  [*reh'g denied*, 393 U.S. 900] (1968). Rather, it is governed by the strict scrutiny found in *Tinker*

14  *v. Des Moines Independent Community School Dist.*, 383 U.S. 503, 89 S.Ct. 733 (1969)(black

15  armbands worn by students to protest war was "akin to pure speech") and *West Virginia State*

16  *Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178 (1943)(requirement that students

17  salute the Flag and recite the Pledge of Allegiance for the "purpose of teaching, fostering and

18  perpetuating the ideals, principles and spirit of Americanism, and increasing the knowledge of the

19  organization and machinery of the government" was compelled speech).

20  The First Amendment rights of students in public schools is clearly established–they do not

21  "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."

22  *Tinker*, 393 U.S. at 506, 89 S.Ct. at 736 (1969). Courts construe the First Amendment as applied

23  to public schools in a manner that attempts to strike a balance between the free speech rights of

24  students and the special need to maintain a safe, secure and effective learning environment. *See,*

25  *e.g., Tinker,* 393 U.S. at 507, 89 S.Ct. 733 (balancing the need for "scrupulous protection of

26  Constitutional freedoms of the individual" against the need of schools to perform their proper

27  educational function). Students cannot be punished merely for expressing their personal views on

28  the school premises ... unless school authorities have reason to believe that such expression will

1    "'substantially interfere with the work of the school or impinge upon the rights of other

2    students.'" *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98

3    L.Ed.2d 592 (1988), quoting *Tinker*, 393 U.S. at 509, 512-13, 89 S.Ct. at 738, 739-40. This

4    court has expressly recognized the need for such balance: "States have a compelling interest in

5    their educational system, and a balance must be met between the First Amendment rights of

6    students and preservation of the educational process." *LaVine v. Blaine Sch. Dist.*, 257 F.3d 981,

7    988 (9th Cir.2001). "The First Amendment protects not only the expression of ideas through

8    printed or spoken words, but also symbolic speech — nonverbal 'activity . . . sufficiently imbued

9    with elements of communication.'" *Roulette v. City of Seattle*, 97 F.3d 300, 302-03 (9th Cir.

10   1996) quoting *Spence v. Washington*, 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974).

11          "In deciding whether particular conduct possesses sufficient communicative elements to

12   bring the First Amendment into play, we [must] ask[] whether '[a]n intent to convey a

13   particularized message was present, and [whether] the likelihood was great that the message

14   would be understood by those who viewed it.'" *Texas v. Johnson*, 491 U.S. 397, 404 (1989),

15   quoting *Spence*, 418 U.S. at 410-11. In assessing this, the Court does not, as Defendants

16   suggest, view the message in a vacuum. Motion, 8:8-15. The Court must look to the "particular

17   activity, combined with the factual context and environment in which it was undertaken." *See*

18   *Spence*, 418 U.S. at 409-10.

19          Plaintiffs' FAC sets forth allegations which show: (1) Plaintiffs openly, verbally and in

20   writing, protested the implementation of mandatory school uniforms at Roy Gomm beginning

21   April 27, 2011 and continuing to date. FAC ¶ 58-60; (2) On June 2, 2011, Defendant Rauh

22   personally met with Plaintiff Mary Frudden as well as Andrea Hughs-Baird and Leilani

23   Schweitzer, two other Roy Gomm parents, wherein Defendant Rauh was advised of their

24   grievances with the implementation of mandatory uniforms at Roy Gomm. FAC ¶¶ 91-94; (3) On

25   June 6, 2011, Defendants Pilling, Rauh, Morisson and Hunsberger as well as the WCSD's board

26   of trustees received Plaintiffs' 38-page written complaint of protest. FAC ¶¶ 95-98; (4) From

27   August 29, 2011 to September 9, 2011, Plaintiff students wore non-uniform clothing to school.

28   FAC ¶ 106; (5) On September 12 and 13, 2011, Plaintiff students wore clothing to school

1  displaying words and symbols of the American Youth Soccer Organization ("AYSO"), a

2  nationally recognized youth organization. FAC ¶¶ 107, 123; (6) Plaintiff students were disciplined

3  for wearing the AYSO uniforms and were compelled to change into the mandatory Roy Gomm

4  school uniform although there was no substantial interruption with the school environment. FAC

5  ¶¶ 110-125; (7) On September 14, 2011, John Doe wore the Roy Gomm uniform shirt inside out,

6  was sent to Defendant Pilling's office for failure to comply with the mandatory uniform policy and

7  was requested to and did turn the uniform shirt right side out so that the logo and written words

8  could be viewed.  FAC ¶ 126.

9        Contrary to Defendants' assertion, Plaintiffs' FAC does not "admit" Plaintiffs wore the

10  soccer uniform "*merely* because they fell within an 'exemption' to the policy." Motion, 8:14-15;

11  FAC ¶ 108-114.  By consciously choosing the "uniform" of another "team"--AYSO--Plaintiff

12  students were protesting the Written Uniform Policy and were saying, via the AYSO uniform,

13  they did not want to be a part of the Roy Gomm One Team, One Community, a message, at the

14  very least, "akin" to pure speech.  In addition, Plaintiff students were proclaiming with pure

15  speech their affiliation with the AYSO "team."  Likewise, by turning his Roy Gomm shirt inside-

16  out, John Doe was saying with conduct akin to pure speech, that he did not want to be compelled

17  to wear the message of "Roy Gomm One Team, One Community" and "Tomorrow's Leaders."

18  Given these particular activities, combined with the factual context and environment in which it

19  was undertaken, it is clear Plaintiff students were sending their *continued* message of protest and

20  their outward support of, and affiliation with, another "team."

21        Defendants also fail to recognize that the Written Uniform Policy is not content or

22  viewpoint neutral.  A statute regulating speech is content-neutral only if the state can justify it

23  without reference either to the content of the speech it restricts or to the direct effect of that

24  speech on listeners. *Lind v. Grimmer*, 30 F.3d 1115, 1117 (9th Cir. 1994), *cert. denied*, 513 U.S.

25  1111, 115 S.Ct. 902 (1995).  If the state's justifications for the statute stem from the "direct

26  communicative impact of the speech," then the statute regulates speech on the basis of its content.

27  *Id.*, 30 F.3d at 1118.  "'Viewpoint discrimination is . . . an egregious form of content

28  discrimination,' and occurs when 'the specific motivating ideology or the opinion or perspective

1   of the speaker is the rationale for the restriction [on speech].'" *Truth v. Kent School Dist.*, 542

2   542 F.3d at 649-50 (9ᵗʰ Cir. 2008)(ellipsis in original), quoting *Rosenberger v. Rector & Visitors*

3   *of the University of Virginia*, 515 U.S. 891, 829 (1995).  A restriction on speech is unconstitu-

4   tional if it is "an effort to suppress expression merely because public officials oppose the speaker's

5   view." *Alpha Delta Chi-delta Chapter v. Reed*, No. 3:05-cv-02186-LAB-AJB, 9994-9995 (9th

6   Cir. Aug. 2011), quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46

7   (1983).

8          Given the express statement of purpose found in the Written Uniform Policy, it is apparent

9   that it imposes burdens that are based on the content of speech and that are aimed at a particular

10  viewpoint and content.  "[T]he fundamental rule of protection under the First Amendment [is]

11  that a speaker has the autonomy to choose the content of his own message." *Hurley v. Irish-*

12  *American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 573, 115 S.Ct. 2338

13  (1995).  Burdening the speech of some to increase the speech of others is a concept "wholly

14  foreign to the First Amendment." *Buckley v. Valeo*, 424 U. S. 1, 48-49 (1976).  Mandating

15  speech that a speaker would not otherwise make necessarily alters the content of the speech. *Riley*

16  *v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 795, 108 S.Ct. 2667

17  (1988).

18         Here, the uniform shirt is employed as a symbol of adherence to Roy Gomm school's One

19  Team, One Community and to accept and promote the message that Roy Gomm students are

20  "Tomorrow's Leaders."  Although Plaintiffs have no qualms with the Plaintiff students becoming

21  "tomorrow's leaders," they do take offense that, under the circumstances giving rise to this case,

22  the message carries with it the necessary implication that tomorrow's leaders from Roy Gomm

23  will gain such status by adhering to the same kind of invalid, illegal and unconstitutional methods

24  employed by Defendants in implementing mandatory uniforms and in promulgating the Written

25  Uniform Policy.

26         Like the students in *Barnette*, 319 U.S. 624, 633, 63 S.Ct. 1178 (1943), compelled

27  adherence with the Written Uniform Policy "requires the individual to communicate by word and

28  sign his acceptance of the political ideas it thus bespeaks.  Objection to this form of

1  communication when coerced is an old one, well known to the framers of the Bill of

2  Rights.[note]"

3          Plaintiffs' Second Claim for Relief sets forth clearly established rights under the First

4  Amendment which have long been recognized by the United States Supreme Court.  Defendants'

5  Motion should be denied.

6          C.      **THIRD CLAIM FOR RELIEF**

7          Defendants reliance on the rational basis test as set forth in *Littlefield v. Forney ISD*, 268

8  F.3d 275 (5th Cir. 2001) for governing Plaintiff parents' rights, Motion, 9:17-22, is misplaced in

9  light of recent Federal and state laws which now command effective, meaningful parental

10 involvement.

11         Pursuant to the parental involvement policy of the No Child Left Behind Act of 2001, set

12 forth at 20 U.S.C. §6318 and Nevada's express adoption of such policy, NRS 392.457 and

13 392.4575, it can no longer be asserted that parental rights in the public schools are of any *less*

14 *importance* than the public schools' interest in fostering education and safe environments.  Rather,

15 parents are to be treated as *partners*.

16         As stated in Section 6318(d), Shared Parental Involvement for High Academic Standards,:

17                 As a component of the school-level parental involvement policy
                   developed under subsection (b) of this section, each school served
18                 under this part shall jointly develop with parents for all
                   children served under this part a school-parent compact that
19                 outlines how parents, the entire school staff, and students *will
                   share the responsibility for improved student academic
20                 achievement and the means by which the school and parents will
                   build and develop a partnership to help children achieve the
21                 State's high standards*. [Emphasis added].

22 It is clear that fostering meaningful parental involvement is now an overriding goal.

23                 To ensure effective involvement of parents and to support a
                   partnership among the school involved, parents, and the community
24                 to improve student academic achievement, each school and
                   local educational agency assisted under this part . . . shall educate
25                 teachers, pupil services personnel, principals, and other staff, with
                   the assistance of parents, in the value and utility of contributions of
26                 parents, and in how to reach out to, communicate with, *and work
                   with parents as equal partners*, implement and coordinate parent
27                 programs, and build ties between parents and the school. [Emphasis
                   added].

28

1  20 U.S.C. 6318(e)(3).

2      Here the express, main "purpose" of the Roy Gomm School Uniform Policy "is to

3  establish a culture of 'one team, one community' at Roy Gomm Elementary School. As such,

4  uniforms serve to foster school spirit and unity, as well as a disciplined and safe learning

5  environment.  Students will feel like they are part of a 'team' working toward the goal of

6  academic excellence."  FAC, ¶ 89.  School spirit and unity are the main, expected benefits,

7  whereas a "disciplined and safe learning environment" is said to be only *indirectly* affected.

8      "The very purpose of the First Amendment is to foreclose public authority from assuming

9  a guardianship of the public mind through regulating the press, speech, and religion." *Thomas v.*

10  *Collins,* 323 U.S. 516, 545, 65 S.Ct. 315, 329, 89 L.Ed. 430 (1945) (Jackson, J., concurring).

11  "To this end, the government, even with the purest of motives, may not substitute its judgment as

12  to how best to speak for that of speakers and listeners; free and robust debate cannot thrive if

13  directed by the government." *Riley v. National Federation of the Blind of North Carolina, Inc,*

14  487 U.S. 781, 791, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988).  Plaintiff parents' fundamental

15  rights and the liberty interests conferred by way of Federal and state laws and the WCSD rules,

16  regulations and policies can not be undermined by a policy which purpose is merely to "foster

17  school spirit and unity" through a culture of "one team, one community." *Barnette*, 319 U.S. 624,

18  63 S.Ct. 1178 (1943).  Plaintiffs have set forth allegations which are sufficient to withstand

19  Defendants' Motion to Dismiss their Third Claim for Relief.

20      **D.**    **FOURTH CLAIM FOR RELIEF**

21      Plaintiffs' Fourth Claim for Relief is premised upon a violation of procedural and

22  substantive due process.  Plaintiffs' Fourth Claim sets forth allegations which establish a

23  deprivation of Plaintiffs' protected liberty interests.  Liberty interests "may arise from two

24  sources—the Due Process Clause itself and the laws of the States." *Hewitt v. Helms,* 459 U.S.

25  460, 466, 103 S.Ct. at 868 (1983).  A State creates a protected liberty interest by placing

26  substantive limitations on official discretion. *Olim v. Wakinekona,* 461 U.S. 238, 249, 103

27  S.Ct.1741, 1747 (1983). A State may do this in a number of ways, however, the most common

28  manner in which a State creates a liberty interest is by establishing "substantive predicates" to

1   govern official decision-making, *Hewitt v. Helms,* 459 U.S., at 472, 103 S.Ct., at 871, and,

2   further, by mandating the outcome to be reached upon a finding that the relevant criteria have

3   been met.  Plaintiffs assert state laws and WCSD rules, regulations and policies regarding student

4   dress and discipline have created such a liberty interest protected by the Due Process Clause.

5   Furthermore, Plaintiffs set forth sufficient allegations to show they were stripped not only of their

6   constitutional rights to free speech, free expression and right to parent, but of their liberty interest

7   too, by an unauthorized, invalid voting procedure which was completely void of any procedural

8   safeguards.

9         This is not like the facts in *Jacobs v. Clark County School District*, 526 F.3d 419 (9th Cir.

10   2008) at all.  In *Jacobs*, the Clark County School District adopted a regulation which created a

11   standard dress code for all Clark County students and established a means by which individual

12   schools in the District could establish more stringent mandatory school uniform policies.  The

13   regulation was adopted pursuant to the authority given under NRS 392.458.  The school district

14   then failed to follow their own regulation by failing to conduct the parental survey, which the

15   students said deprived them of due process.  *Id.* at 440.  The Ninth Circuit confirmed that both

16   the statute and the regulation were constitutional and found that plaintiffs' due process was not

17   violated.  *Id.* at 441.

18         In the present case, the PFA and the Uniform Committee established arbitrary and

19   capricious "voting" procedures had absolutely no safeguards.  FAC, ¶ 67.  Even assuming the

20   PFA and the Uniform Committee had the requisite *authority* (which Plaintiffs contend they do

21   not), it cannot be disputed that the lack of procedural safeguards so infected the voting process as

22   to render it a violation of due process which resulted in the loss of Plaintiffs' constitutionally

23   protected rights.  This was not, as in *Jacobs*, the government's policymaking.  The action here

24   was private entities acting under color of law to deprive Plaintiffs of their constitutional rights.

25         Plaintiffs' Fourth Claim for Relief also challenges the unfettered discretion granted in the

26   Written Uniform Policy.  FAC, ¶ 191.  Where government officials are endowed with unbridled

27   discretion to regulate in the First Amendment arena, the Supreme Court has consistently held that

28   legal provision subjecting the exercise of the Freedom of Expression to a prior granting of

1    permission that is "without narrow, objective, and definite standards to guide the licensing

2    authority, is unconstitutional." *See, e.g., City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S.

3    750, 757, 108 S.Ct. 2138 (1988); *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 151,

4    89 S.Ct. 935 .

5          Defendants' argument regarding damages is unavailing.  Motion, 10:22-11:14.  When a

6    plaintiff alleges violation of a constitutional right, the Supreme Court has held that, even if

7    compensatory damages are unavailable because the plaintiff has sustained no "actual injury" —

8    such as an economic loss, damage to his reputation, or emotional distress — nominal damages are

9    nonetheless available in order to "mak[e] the deprivation of such right[ ] actionable" and to

10   thereby acknowledge the "importance to organized society that [the] right[ ] be scrupulously

11   observed." *Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042 (1978).

12   **E.     FIFTH CLAIM FOR RELIEF**[3]

13         The School District's liability can be founded on its policy, including a policy of inaction,

14   or custom which led to Plaintiffs' constitutional deprivations.[4]  *City of Canton, Ohio v. Harris*,

15   489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *Long v.*

16   *County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006).  Furthermore, a choice among

17   alternatives by a municipal official with final decision-making authority may also serve as the basis

18   of municipal liability.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986).  The

19   Court should look to state law to determine, as a matter of law, the officials with final policy-

20   making authority.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 126 (1988);  *See Jett v.*

21   *Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989), *superseded by statute on other grounds as*

22   *stated in, Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1205 (9th Cir.

23   1996).  Finally, ratification of the decisions of a subordinate by an official with final decision-

24   making authority can also be a policy for purposes of municipal liability under § 1983.  *See*

25   _____

26         [3] The arguments set forth under Section II.E. are in response to the arguments made by
     Defendants in their Motion at 5:24-6:25 and at 11:16-12:23.
27

28         [4]The students' constitutional rights to free speech and free expression and Plaintiffs'
     parental rights are, as set forth above, sufficiently pleaded.

1 | *Praprotnik*, 485 U.S. at 127.

2 |         There is no heightened pleading standard with respect to the "policy or custom"

3 | requirement of demonstrating municipal liability. *See Leatherman v. Tarrant County Narcotics*

4 | *Intelligence & Coordination Unit*, 507 U.S. 163, 167-68 (1993). A claim of municipal liability

5 | under §1983 is sufficient to withstand a motion to dismiss 'even if the claim is based on nothing

6 | more than a bare allegation that the individual officers' conduct conformed to official policy,

7 | custom, or practice.'" *Karim-Panahi v. L.A. Police Dep't.*, 839 F.2d 621, 624 (9th Cir. 1988),

8 | quoting *Shah v. County of Los Angeles*, 797 F.2d 743, 747 (9th Cir. 1986). "[I]t is enough if the

9 | custom or policy can be inferred from the allegations of the complaint." *Shaw v. Cal. Dep't of*

10 | *Alcoholic Beverage Control*, 788 F.2d 600, 610 (9th Cir. 1986).

11 |         Plaintiffs' Fifth Claim for Relief sets forth factual allegations establishing WCSD's liability

12 | as a result of: (1) a policy of inaction; and/or (2) a choice among alternatives by a municipal

13 | official with final decision-making authority; and/or (3) ratification a Defendant having "final

14 | policy-making authority;" FAC, ¶¶ 13, 25-35, 59, 60, 80-86, 88, 93-100, 112-115, 122, 199-200,

15 | 205, 207, 228-223.

16 |         Defendants assert FAC, ¶ 201 alleges "there is *no* 'comprehensive dress code' policy."

17 | Motion, 12:9-11. Paragraph 201 does not make this allegation. Moreover, Defendants confuse

18 | the word "policy" as used in the phrase "a policy of inaction," with the word "policy" as used in

19 | the phrase "comprehensive dress code policy." The words have absolutely different meanings

20 | under the two phrases. The "long-standing practice or custom" is not, as asserted by Defendants,

21 | Motion, 6:14-16, confined to the specific conduct which gives rise to Plaintiffs' claim. Rather, it

22 | embraces a custom or practice which can be "inferred from widespread practices or 'evidence of

23 | repeated constitutional violations for which the errant municipal officers were not discharged or

24 | reprimanded.'" *Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001),

25 | quoting *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992), abrogated on other grounds as

26 | recognized in *Beck v. City of Upland*, 527 F.3d 853, 862 n.8 (9th Cir. 2008).

27 |         Thus, in the present case, if Plaintiffs' allegations are taken as true, then WCSD could be

28 | held liable for monetary damages, injunctive and declaratory relief. Plaintiffs assert there Fifth

1    Claim for Relief adequately sets forth factual allegations that plausibly give rise to liability.

2         Even if WCSD was the final policy-making authority, as Defendants contend, Motion,

3    6:19-21, this does nothing to insulate it from liability since the board endorsed and ratified the

4    unauthorized conduct on June 28, 2011.  FAC, ¶ 100.

5    **F.    SIXTH CLAIM FOR RELIEF**

6         Plaintiffs Sixth Claim for Relief establishes WCSD's liability by demonstrating the

7    constitutional violations were caused by a failure to train municipal employees adequately. *See*

8    *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-91 (1989); *Price v. Sery*, 513 F.3d 962, 973

9    (9th Cir. 2008).  Defendants insist the allegations of Plaintiffs' Sixth Claim for Relief are "very

10   generic" and "pointless" because it fails to identify the training supervisor and the type and

11   content of the training.  Motion, 13:21-26.

12        On the contrary, Plaintiffs' Claim states that WCSD failed to train the Principal, the Area

13   Superintendent and the Superintendent and WCSD ignored the problem of which it was aware.

14   FAC, ¶¶ 214-216.  In *Board of County Commissioners v. Brown*, 520 U.S. 397, 117 S.Ct. 1382,

15   137 L.Ed.2d 626 (1997), the Supreme Court discussed the circumstances under which inadequate

16   training can be the basis for municipal liability.  The first is a deficient training program, "intended

17   to apply over time to multiple employees." *Id.* at 407, 117 S.Ct. 1382 (citation omitted). The

18   continued adherence by policymakers "to an approach that they know or should know has failed

19   to prevent tortious conduct by employees may establish the conscious disregard for the

20   consequences of their action--the 'deliberate indifference'—necessary to trigger municipal

21   liability." *Id.* (citation omitted).  Further, "the existence of a pattern of tortious conduct by

22   inadequately trained employees may tend to show that the lack of proper training, rather than a

23   one-time negligent administration of the program or factors peculiar to the officer involved in a

24   particular incident, is the 'moving force' behind the plaintiff's injury." *Id.* at 407-08, 117 S.Ct.

25   1382 (citation omitted).

26        Plaintiffs could also succeed in proving a failure-to-train claim without showing a pattern

27   of constitutional violations where "a violation of federal rights may be a highly predictable

28   consequence of a failure to equip [the employee] with specific tools to handle recurring

1   situations." *Id.* at 409, 117 S.Ct. 1382. The *Brown* Court explained:

2   　　　　　The likelihood that the situation will recur and the predictability
　　　　　that an [employee] lacking specific tools to handle that situation
3   　　　　　will violate citizens' rights could justify a finding that policymakers'
　　　　　decision not to train the [employee] reflected "deliberate
4   　　　　　indifference" to the obvious consequence of the policymakers'
　　　　　choice—namely, a violation of a specific constitutional or statutory
5   　　　　　right.

6   Id.

7   　　　　　The allegations set forth in Plaintiffs' FAC, as a whole, rise to the level of a plausible claim

8   beyond mere speculation for WCSD's failure to train its employees.  Defendants' Motion does

9   not reveal any deficiencies in Plaintiffs' Sixth Claim for Relief and therefore it should be denied.

10   　　　**G.   SEVENTH CLAIM FOR RELIEF**

11   　　　　　The Equal Protection Clause of the Fourteenth Amendment commands that no state shall

12   deny to any person within its jurisdiction the equal protection of the laws. In other words, persons

13   similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Center, Inc.,* 473

14   U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

15   　　　　　Plaintiffs' Seventh Claim is clear and straightforward.  Plaintiff students are students in the

16   Washoe County School District's schools.  With regard to all students in the WCSD's schools,

17   that is, all those similarly situated in the WCSD's schools, should be treated alike.  This is

18   provided for by Federal law and co-extensively by state law.  NRS 388.070.  Plaintiff students are

19   not treated like all other students in the WCSD because they are compelled to speak the message

20   of Roy Gomm One Team, One Community, Tomorrow's Leaders, and are unconstitutionally

21   deprived of their free speech and expression rights.  The factual allegations are facially plausible

22   and a reasonable inference can be drawn that Defendants are liable for the misconduct.

23   Defendants' Motion should be denied.

24   　　　**H.   EIGHTH CLAIM FOR RELIEF**

25   　　　　　Nevada Revised Statutes 393.071 and 393.0717 give the board of trustees the right to

26   grant the use of school buildings or grounds for public, literary, scientific, recreational or

27   educational meetings, or for the discussion of matters of general or public interest and charge the

28   board with the task of making all necessary regulations for the use of school buildings and

1  grounds such activities. In addition, WCSD's Community Engagement Policy, BOT-P1330 states

2  in pertinent part:

3  The school principal shall grant the use of school facilities for
   worthwhile purposes provided that:

4  1. The use does not interfere with the school program.
   2. The use is not for any private gain.

5  3. The use is not for closed (as distinguished from open) political
   meetings.

6  4. The use is not for any program or movement which advocates
   the overthrow of the government of the United States or any state

7  government.
   5. The use is not for an illegal purpose.

8  6. The use complies with all regulations of this section.

9  WCSD's policy does not contain narrowly circumscribed guidelines, and in practice, almost any

10  group can rent school facilities as long as the insurance is paid. *Wallace v. Washoe County*

11  *School Dist.*, 818 F.Supp. 1346, 1350 (D. Nev., 1991)(construing similar provision).  In addition,

12  WCSD opens Roy Gomm to various other organizations for use of its buildings[5], including, but

13  not limited to, Brick 4 Kidz, Chess Kidz, the PFA, for various purposes, and routinely distributes

14  flyers and other informational documents to the students at Roy Gomm.  Thus, WCSD has

15  created a designated open public forum at Roy Gomm. *Id.* at 1350-51; *Gregoire v. Centennial*

16  *School Dist.*, 907 F.2d 1366, 1370 (3rd Cir. 1990).  In such a case, a content-based prohibition

17  must be narrowly drawn to effectuate a compelling state interest. *Perry Education Ass'n. v.*

18  *Perry Local Educators'Ass'n.*, 460 U.S. 37, 47, 103 S.Ct. 948, 956 (1983).

19       A designated public forum is government property "open[ed] for indiscriminate public use

20  for communicative purposes." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S.

21  384, 392 (1993). Speech in a designated public forum has significantly greater protection than

22  speech in a limited public forum—restrictions on speech in a designated public forum are subject

23  to strict scrutiny and, therefore, "'must be narrowly tailored to serve a compelling government

24  interest.'" *Christian Legal Soc'y*, 130 S. Ct. 2971, 2984 n.11 (2010), quoting *Pleasant Grove*

25  *City v. Summum*, 555 U.S. 460, 129 S. Ct. 1125, 1132 (2009).

26  _____

27       [5]Plaintiffs admit they do not at this time possess sufficient information to allege facts
   which would show that WCSD opened its "supplies, copy machines, computers, school staff and

28  faculty members" to any organizations other than the PFA.  The same cannot be said of its
   buildings and distribution of informational materials and flyers.

1    Defendants assert Plaintiffs' Eighth Claim for Relief for Denial of Equal Access to a Public

2    Forum should be dismissed because it is "devoid of allegations that they were subjected to any

3    First Amendment violation." Motion, 17:14-15.  Contrary to this assertion, Plaintiffs' FAC

4    contains the necessary factual allegations sufficient to establish this Claim.  *See* FAC, ¶¶ 56-60,

5    64, allegations overlooked by Defendants in their Motion.  Motion, 17:1,5,6, 11 and 13.  Those

6    allegations, if taken as true, show that Plaintiffs were denied the opportunity to present views

7    opposing mandatory uniforms, including, but not limited to, views regarding the validity, legality

8    and constitutionality of a mandatory uniform policy, the inefficacy of uniforms, and the lack of

9    authority by the PFA, the Uniform Committee and Defendant Pilling to implement such a policy.

10   *Id.*

11       Because Plaintiffs' Eighth Claim contain sufficient factual assertions, which if taken as

12   true, allows the court to draw the reasonable inference that Defendants are liable for the

13   misconduct alleged, Defendants' Motion on this Claim must be denied.

14   **I.    NINTH CLAIM FOR RELIEF**

15       Defendants seek dismissal of Plaintiffs' Ninth Claim for Relief, based upon a violation of

16   NRS 392.4644, because the statute does not provide for a private right of action.

17       Even, assuming *arguendo*, the statute does not provide for a private right of action,

18   Plaintiffs' claims should not automatically be dismissed.  Under the liberal rules of federal

19   practice, dismissal under Federal Rule of Civil Procedure 12(b)(6) is proper "only where there is

20   no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal

21   theory." *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir.2001).  A plaintiff's "complaint is not to be

22   dismissed because the plaintiffs lawyer has misconceived the proper legal theory of the claim, but

23   is sufficient if it, shows that the plaintiff is entitled to any relief which the court can grant,

24   regardless of whether it asks for the proper relief." *United States v. Howell,* 318 F.2d 162, 166

25   (9th Cir.1963).

26       Plaintiffs Ninth Claim sufficiently states a cause of action on which relief could be granted.

27   Although the Claim makes reference to provisions in NRS 392.4644 which do not provide for

28   private rights of action, a common law claim is also asserted, similar to that stated in Plaintiffs'

1   Eleventh Claim for Relief and accordingly, this claims presents a cognizable legal theory.  The

2   statute is by no means irrelevant just because it does not provide for a private right of action.

3   Courts frequently look to statutes to determine appropriate standards of conduct.

4          Moreover, when a violation of state law causes the deprivation of a right protected by the

5   United States Constitution, that violation may form the basis for a Section 1983 action. *Hallstrom*

6   *v. City of Garden City*, 991 F.2d 1473, 1482, n. 22 (9th Cir. 1993)(holding that the violation of a

7   state law requiring a post-arrest hearing before a magistrate judge constituted a cause of action

8   under Section 1983), cert. denied, 510 U.S. 991, 114 S.Ct. 549, 126 L.Ed.2d 450 (1993).

9          Finally, a state may create a protected property or liberty interest by placing substantive

10   limitations on official discretion with "particularized standards" or "objective and defined criteria."

11   *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983), quoting

12   *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 467, 101 S.Ct. 2460, 2466, 69

13   L.Ed.2d 158 (1981) (Brennan, J., concurring).  In order to create a protected interest the State

14   must use "language of an unmistakably mandatory character, requiring that certain procedures

15   'shall,' 'will,' or 'must' be employed." *Hewitt v. Helms*, 459 U.S. 460, 471-72, 103 S.Ct. at 871

16   (1983).

17          A state creates a liberty interest by both (1) establishing 'substantive predicates to govern

18   official decisionmaking,' and (2) using 'explicitly mandatory language, i.e., specific directives to

19   the decisionmaker that if the regulations' substantive predicates are present, a particular outcome

20   must follow.'" *Smith*, 994 F.2d at 1405, quoting *Thompson*, 490 U.S. at 462-63, 109 S.Ct. at

21   1909-10.

22          "A person's liberty is equally protected, even when the liberty itself is a statutory creation

23   of the State. The touchstone of due process is protection of the individual against arbitrary action

24   of government." *Wolff*, 418 U.S. at 558, 94 S.Ct. at 2975, citing, *Dent v. West Virginia*, 129 U.S.

25   114, 123, 9 S.Ct. 231, 233, 32 L.Ed. 623 (1889).

26   **J.      TENTH CLAIM FOR RELIEF**

27          Plaintiffs' Tenth Claim for Relief is premised upon violations of Nevada's Open Meeting

28   Law, NRS 241.010 *et seq*. FAC, ¶7; *see also* ¶273.

1    Defendants move to dismiss the Claim asserting it is not a legally cognizable claim because

2  the Uniform Committee did not advise the school board "*at the board's request*"and because the

3  Claim is time barred.  Motion, 21:9-22:17 [emphasis in Motion].  Defendants are wrong on both

4  counts. Addressing the second contention first, Plaintiffs' Complaint clearly sets forth facts which

5  show conduct which could be considered "action," as that term is defined by NRS 241.015(1)(a),

6  which occurred no earlier than May 8, 2011 and as late as June 28, 2011.  Plaintiffs claim the

7  Uniform Committee took "action" when it promulgated the Written Uniform Policy, which took

8  place at one or more meetings held at Roy Gomm Elementary School between May 8, 2011 and

9  May 31, 2011.  FAC, ¶¶ 90, 274, 302.  In addition, on June 28, 2011, the WCSD thereafter

10  "considered matters voiced" in Mary Frudden's June 6, 2011 letter and permitted Roy Gomm

11  Elementary School to "mov[e] forward with the implementation of uniforms for the 2011-2012

12  school year." FAC, ¶¶ 95-100.  Plaintiffs' original Complaint was filed on July 6, 2011.  Thus,

13  Plaintiffs' Tenth Claim for Relief is clearly not time-barred.

14    As to their first contention, Defendants cite to no authority for their proposition that an

15  advisory board must advise at the request of a public body.  Motion, 21:10-17.  Nothing in the

16  Open Meeting Law requires "action" to be performed at the request of a public body.  On the

17  contrary, "action" is defined as "[a] decision made by a majority of the members present during a

18  meeting of a public body."  NRS 241.015(1)(a).  The Nevada Attorney General has opined:

19       Formality in appointment does not seem to be a dispositive factor in
         the statutory definition, and we believe that informality should not
20       be an escape from it. To hold otherwise is to encourage
         circumvention of the Open Meeting Law through the use of
21       unofficial committees.

22  Nev.Att.Gen, OMLO 98-04 (July 7, 1998)(Informal "brainstorming" sessions undertaken by two

23  members of WCSD board of trustees on their own accord still considered meeting of a public

24  body).  A "public body" is:

25       any administrative, advisory, executive or legislative body of the
         State or a local government which expends or disburses or is
26       supported in whole or in part by tax revenue or which advises or
         makes recommendations to any entity which expends or disburses
27       or is supported in whole or in part by tax revenue, including, but
         not limited to, any board, commission, committee, subcommittee or
28       other subsidiary thereof . . . .

1  NRS 241(3)(a).

2        Defendants' reliance on NRS 392.458 is of no consequence with regard to violations of

3  the Open Meeting Law for several reasons. First, as evidenced by the letter dated June 28, 2011

4  from Defendant Rauh, an Area Superintendent for the WCSD, the WCSD board of trustees took

5  "action" on or about June 28, 2011 when it endorsed and ratified Roy Gomm's implementation of

6  uniforms for the 2011-2012 school year (which necessarily included the Written Uniform Policy).

7  FAC, ¶ 100.  This matter was never made part of any notice or agenda of the WCSD's board of

8  trustees and was not determined in accordance with the Open Meeting Law.  Thus, the board's

9  endorsement and ratification of the Written Uniform Policy is "action" which was taken by the

10  board of trustees.  It is void pursuant to NRS 241.036.  *See* Nv.Att.Gen. OMLO 98-03 (July 7,

11  1998)(Warning WCSD Board of Trustees to consider or take action only on items that are clearly

12  listed on its meeting agendas, to assure that its minutes reflect the substance of all matters

13  discussed or decided, and to assure that all of its committees and subcommittees comply with the

14  Open Meeting Law, or the office would take legal action).

15        Second, if the Written Uniform Policy is valid and enforceable, it is difficult to see how the

16  Uniform Committee can be considered anything other than a "public body" taking "action" where

17  it has performed the very function expressly granted to the school districts' board of trustees

18  pursuant to NRS 392.458 (ie. establishing a policy that requires pupils to wear school uniforms)

19  and where the WCSD board of trustees endorsed and ratified that action.  The Nevada Attorney

20  General stated it clearly:

21                  It would be incongruous to argue that it is not really a "committee,
                subcommittee or subsidiary" of the Board under the Open Meeting

22                  Law because of the lack of formality in appointment. Otherwise,
                public bodies would be encouraged to break up into little unofficial

23                  groups and do business in the shadows, stepping into the sunshine
                to perfunctorily approve what has already been decided, which

24                  would be completely contrary to the intent expressed in NRS
                241.010 that public bodies take their actions and conduct their

25                  deliberations in the open.

26  Nev.Att.Gen., OMLO 98-03 (July 7, 1998)(A subcommittee informally appointed by the

27  president of WCSD's board of trustees was a public body as defined in NRS 241.015(3) where,

28  even though the subcommittee was not formally appointed, its members shared equal voting

1   power, formed a consensus to speak to the school board with one voice, and the school board

2   knew of its existence and treated it as a board subcommittee).

3       Third, the mandates set forth in NRS 386.365 (required before adopting, repealing or

4   amending a policy or regulation of the board concerning pupil discipline) foreclose any attempt by

5   the board of trustees (or anyone acting on its behalf) to establish a policy requiring students to

6   wear uniforms where, as here, such policy includes progressive disciplinary action against a

7   student for violation of the mandatory uniform policy, **without complying with the Open**

8   **Meeting Law**. *See* Nev.Att.Gen., OMLO 2006-07(a meeting held pursuant to NRS 386.365 by a

9   board of trustees to adopt, repeal or amend board policies or regulations must also comply with

10  the Open Meeting Law because it meets the elements of the definition of a "Meeting" found in

11  NRS 241.015(2)(a)(1)).

12      The Legislature has declared that "all public bodies exist to aid in the conduct of the

13  people's business. It is the intent of the law that their actions be taken openly and that their

14  deliberations be conducted openly." This case presents the very concerns the Open Meeting Law

15  is designed to protect. Plaintiffs' Tenth Claim is not time-barred and sufficiently sets forth a

16  legally cognizable claim against the Uniform Committee and the WCSD board of trustees.

17      **K.   ELEVENTH CLAIM FOR RELIEF**

18      Defendants' argument overlooks relevant Nevada statutes, which, in combination with the

19  constructs of Nevada case law provide an overwhelming basis on which to deny Defendants'

20  Motion on this Breach of Special Relationship Claim.

21      Under Nevada law, "[a] fiduciary relationship is deemed to exist when one party is bound

22  to act for the benefit of the other party. Such a relationship imposes a duty of utmost good faith."

23  *Hoopes v. Hammargren,* 102 Nev. 425, 725 P.2d 238, 242 (1986). "The essence of a fiduciary or

24  confidential relationship is that the parties do not deal on equal terms, since the person in whom

25  trust and confidence is reposed and who accepts that trust and confidence is in a superior position

26  to exert unique influence over the dependent party." *Id.* [internal quotation marks and citation

27  omitted].

28      In Nevada, the existence of a "special relationship" imposes a duty to disclose. Under

1   these circumstances, "[n]ondisclosure . . . become[s] the equivalent of fraudulent concealment."

2   *Mackintosh v. Jack Matthews & Co.,* 109 Nev. 628, 855 P.2d 549, 553 (1993).  In order to prove

3   the existence of a special relationship, a party must show that (1) "the conditions would cause a

4   reasonable person to impart special confidence" and (2) the trusted party reasonably should have

5   known of that confidence.  *Mackintosh v. Cal. Fed. Sav. & Loan Ass'n,* 113 Nev. 393, 935 P.2d

6   1154, 1160 (1997) (per curiam).

7          In the present case, the fiduciary/special relationship between Plaintiff students and

8   Defendants Pilling, Rauh and Morrison is expressly provided for in the educational involvement

9   accord required to be utilized by public schools in Nevada.  As stated therein, the responsibilities

10  of a public school and the administrators, teachers and other personnel employed at a school,

11  include, without limitation: (1) Ensuring that each pupil is provided proper instruction,

12  supervision and interaction; (2) Maximizing the educational and social experience of each pupil;

13  and (3) Carrying out the professional responsibility of educators to seek the best interest of each

14  pupil.  NRS 392.4575(2)(c).

15         Likewise, the fiduciary/special relationship between Plaintiff parents and Defendants

16  Pilling, Rauh and Morrison, is also set forth in the educational involvement accord, which

17  provides for the "[i]nclusion of parents as full partners in decisions affecting their children and

18  families."  NRS 392.4575(1)(b) and 392.457(2)(e).  The fiduciary duty that partners owe one

19  another has been described as follows:

20                 The fiduciary duty among partners is generally one of full and frank
                   disclosure of all relevant information for just, equitable and open
21                 dealings at full value and consideration. Each partner has a right to
                   know all that the others know, and each is required to make full
22                 disclosure of all material facts within his knowledge in anything
                   relating to the partnership affairs. The requirement of full disclosure
23                 among partners in partnership business cannot be escaped.... Each
                   partner must ... not deceive another partner by concealment of
24                 material facts.

25  59(A) Am.Jur.2d Partnership § 425 (1987).  In addition, a partner's motives or intent do not

26  determine whether his actions violate his fiduciary duty. *Id.* at § 423.

27         Plaintiffs assert Defendants owed them the fiduciary duty to maximize their education and

28  social experience and to carry out their professional responsibility as educators to seek the best

1    interest of each student as well as the fiduciary duty of full disclosure of material facts relating to

2    decisions affecting them. Because the duties imposed upon Defendants are of a fiduciary and

3    special nature, the cases cited by Defendants regarding confidential relationships not rising to level

4    of fiduciary relationships, Motion, 23:4-24:9 are inapposite. Plaintiffs' Eleventh Claim should not

5    be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

6               **L.    TWELFTH CLAIM FOR RELIEF**

7               Plaintiffs' Twelfth Claim centers around the false and inaccurate statements and omissions

8    made by Defendants Pilling, Rauh and Morrison between May 18, 2010 and at least June 8, 2011.

9    Defendants' objection to the use of the terms "Roy Gomm parents and students" notwithstanding,

10   Motion, 25:12-16, it has been alleged that Plaintiffs are parents of students attending Roy Gomm

11   and thus such phrase easily applies to Plaintiffs. FAC, ¶¶ 4-5. In addition, the FAC clearly asserts

12   the falsity of the representations (and/or omissions) attributed to each of the foregoing

13   Defendants. FAC, ¶ 306. Plaintiffs' Claim has been plead with the particularity required by

14   Fed.R.Civ.P. 9(b). The Claim identifies the time, place and content of the alleged

15   misrepresentation; it explains why the alleged statement(s) were false when made; and asserts that

16   the certain Defendants made the false representation (or omissions) with the intent to induce

17   Plaintiffs to act. The particular factual allegations, if taken as true, allow the court to draw the

18   reasonable inference that Defendants are liable for the misconduct alleged and thus the Claim

19   withstands Defendants' Motion to Dismiss.

20              **M.    THIRTEENTH CLAIM FOR RELIEF**

21              The purpose of the Nevada Public Records Act, NRS Chapter 239, is to ensure the

22   accountability of the government to the public by facilitating public access to vital information

23   about governmental activities. *DR Partners v. Bd. of County Comm'rs*, 6 P.3d 465, 469, 116

24   Nev. 616 (Nev., 2000). As alleged in the FAC, Plaintiffs were denied public records when they

25   were not afforded the right to view the ballots. FAC, ¶¶ 68, 77. While records may be compelled

26   via a writ of mandamus, nothing in the Act prohibits an action for damages. Although a private

27   right of action is not expressly provided for in the Nevada Public Records Act, one can be implied

28   because only "[a] public officer or employee who acts in good faith in disclosing or refusing to

1  disclose information and the employer of the public officer or employee are immune from liability

2  for damages, either to the requester or to the person whom the information concerns." 239.012.

3  Plaintiffs Thirteenth Claim sufficiently sets forth allegations, which, if taken as true, entitle them to

4  relief.

5        **N.**    **FOURTEENTH CLAIM FOR RELIEF**

6        Plaintiffs acknowledge a claim for attorney's fees is dependent upon success of Plaintiffs'

7  claims. Nevertheless, Plaintiffs' claims should not be dismissed until fees are no longer available.

8        **O.**    **FIFTEENTH AND SIXTEENTH CLAIMS FOR RELIEF**

9        Defendants assert Plaintiffs' Fifteenth and Sixteenth Claims should be dismissed because

10  injunctive and declaratory relief are remedies and not causes of action. Motion, 28:12-13. The

11  cases cited by Defendants are inapposite.

12        In *Gillespie v. Countrywide Bank FSB*, case no. 3:09-cv-556-JCM-VPC at p. 5 (D.Nev.

13  August 19, 2011), although the Court did state these were remedies, the Court's dismissal of

14  these claims was only made after determining all other claims–plaintiff's entire Complaint–failed

15  to state claims upon which relief could be granted.

16        In *Stock West, Inc. v. Confederated Tribes of Colville Reservations*, the Plaintiff's

17  Complaint asserted subject matter jurisdiction was based upon the Declaratory Judgment Act, 28

18  U.S.C. 2201. The Court determined there must be an independent basis for jurisdiction in order

19  to obtain declaratory relief in federal court. In the present case, Plaintiffs have asserted

20  jurisdiction based upon 28 U.S.C. §§ 1331 and 1367. Complaint, 2:9-11. Defendants did not

21  contend the Court lacks subject matter jurisdiction.

22        Finally, in *In re Wal-Mart Wage & Hour Employment Practices Litig.*, 490 F.Supp.2d

23  1091, 1130 (D.Nev. 2007) the Court expressly found:

24          Although denominated as a separate claim, count nine is not a
        separate cause of action but a request for injunctive relief. The

25          Court will not foreclose the remedy of injunctive relief at this stage
        of the proceedings. The Court therefore will deny Defendants'

26          motion to dismiss count nine with the understanding that count nine
        is not an independent ground for relief.

27          Both of these claims are derivative of Plaintiffs' other substantive
        claims, which all fail. Accordingly, Plaintiffs' third and fourth claims

28          for relief must also be dismissed.

1    Nothing in the authorities provided by Defendants supports a dismissal of requests for

2    declaratory and injunctive relief merely because they do not constitute separate "claims." Where,

3    as here, Plaintiffs' FAC contains viable claims which would entitle them to either declaratory or

4    injunctive relief, or both, the "claims" should not be dismissed.

5    **P.    QUALIFIED IMMUNITY**

6    Defendants are not entitled to qualified immunity. "The proponent of a claim to absolute

7    immunity bears the burden of establishing the justification for such immunity." *Antoine v. Byers &*

8    *Anderson, Inc.*, 508 U.S. 429, 432 (1993); *see also Buckley v. Fitzsimmons*, 509 U.S. 259, 269

9    (1993); *Goldstein v. City of Long Beach*, 481 F.3d 1170, 1173 (9th Cir. 2007), cert. granted, 128

10   S. Ct. 1872 (U.S. Apr. 14, 2008) (No. 07-854); *Botello v. Gammick*, 413 F.3d 971, 976 (9th Cir.

11   2005); *Genzler v. Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005). Qualified immunity is only an

12   immunity from suit for damages, it is not an immunity from suit for declaratory or injunctive

13   relief. *See Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir. 2007), petition for cert. filed, 76

14   U.S.L.W. 3410 (U.S. Jan. 17, 2008) (No. 07-958); *L.A. Police Protective League v. Gates*, 995

15   F.2d 1469, 1472 (9th Cir. 1993); *Am. Fire, Theft & Collision Managers, Inc.* v. *Gillespie*, 932

16   F.2d 816, 818 (9th Cir. 1991).

17   Qualified immunity is not available where the government actor was not performing a

18   discretionary function. *Ward v. County of San Diego*, 791 F.2d 1329, 1332 (9th Cir. 1986), *cert.*

19   *denied, Duffy v. Ward*, 483 U.S. 1020 (1987). The discretionary function exception will not

20   apply when a statute, regulation, or policy specifically prescribes a course of action for an

21   employee to follow. The statutory directive must be adhered. *Berkovitz v. United States*, 486

22   U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531, 536 (1988).

23   In addition, where an officer's actions are "attributable to bad faith, immunity does not

24   apply whether an act is discretionary or not." *Falline v. GNLV Corp.*, 107 Nev. 1004, 1009, 823

25   P.2d 888 (Nev.1991); *see also Jordan v. State Dep't of Motor Vehicles,* 121 Nev. 44, 49 n. 66,

26   110 P.3d 30 (Nev.2005). NRS 41.032(2) provides immunity to contractors, officers, employees,

27   agents and political subdivisions of the State for the performance or non-performance of

28   discretionary acts whether or not the discretion involved is abused.

1
2
3
4
5
6
7
8

> However, an abuse of discretion necessarily involves at least two factors: (1) the authority to exercise judgment or discretion in acting or refusing to act on a given matter; and (2) a lack of justification for the act or inaction decided upon. Bad faith, on the other hand, involves an implemented attitude that completely transcends the circumference of authority granted the individual or entity. In other words, an abuse of discretion occurs within the circumference of authority, and an act or omission of bad faith occurs outside the circumference of authority. Stated otherwise, an abuse of discretion is characterized by an application of unreasonable judgment to a decision that is within the actor's rightful prerogatives, whereas an act of bad faith has no relationship to a rightful prerogative even if the result is ostensibly within the actor's ambit of authority.

9   *Falline*, 107 Nev. at 1009 n. 3, 823 P.2d 888.

10   Government officials do not enjoy qualified immunity from civil damages where their

11   conduct violates "clearly established statutory or constitutional rights of which a reasonable

12   person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73

13   L.Ed.2d 396 (1982); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir.1991). "A public

14   official is not entitled to qualified immunity when the contours of the allegedly violated right were

15   sufficiently clear that a reasonable official would understand that what he [was] doing violate[d]

16   that right." *Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir.1996) (alterations in original) (citations

17   omitted).

18   Determining whether a public official is entitled to qualified immunity "requires a two-part

19   inquiry: (1) Was the law governing the state official's conduct clearly established? (2) Under that

20   law could a reasonable state official have believed his conduct was lawful?" *Browning v. Vernon*,

21   44 F.3d 818, 822 (9th Cir.1995), citing *Act Up!/Portland v. Bagley*, 988 F.2d 868, 871-72 (9th

22   Cir.1993). "The plaintiff need not show the specific action at issue has been previously held

23   unlawful, he need only show that the alleged unlawfulness was apparent in light of preexisting

24   law." *See Seamons v. Snow*, 84 F.3d 1226, 1237 (10th Cir.1996), quoting *Hilliard v. City and*

25   *County of Denver*, 930 F.2d 1516, 1518 (10th Cir.), cert. denied, 502 U.S. 1013, 112 S.Ct. 656

26   (1991).

27   In *Tinker, supra*, the Supreme Court clearly established that students in public schools

28   have the right to freedom of speech and expression. *Tinker*, 393 U.S. at 506, 89 S.Ct. at 736.

1    This is a broad right that would encompass the Plaintiff students' rights.

2         *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178 (1943)

3    clearly established that it is unconstitutional compelled speech to require students to salute the

4    Flag and recite the Pledge of Allegiance for the "purpose of teaching, fostering and perpetuating

5    the ideals, principles and spirit of Americanism, and increasing the knowledge of the organization

6    and machinery of the government."

7         Furthermore, *Jacobs v. Clark County School District*, 526 F.3d 419 (9th Cir. 2008) makes

8    clear that the mid-scrutiny level established in *United States v. O'Brien*, 391 U.S. 367, 377, 88

9    S.Ct. 1673 [*reh'g denied*, 393 U.S. 900] (1968) does not apply to content or viewpoint based

10   regulations.

11        In this case, Defendants have not met their burden to show they are entitled to immunity.

12   They have not shown they were acting within their discretion and it remains to be determined

13   whether they were acting in bad faith.  The laws regarding compelled speech, and viewpoint and

14   content-based restrictions on speech in the public school setting is clearly established.  As such, a

15   reasonable school district employee could not have believed his or her conduct was lawful.

16   **III.    CONCLUSION**

17        Based upon the foregoing, Defendants' Motion to Dismiss should be denied in its entirety.

18

19        Respectfully submitted this 23 day of November, 2011.

20

21        By: _____
          MARY FRUDDEN, ESQ.

22        Nevada State Bar No. 3973
          and JON E. FRUDDEN

23        *Pro Se*
          1902 Carter Dr.

24        Reno, NV 89501
          Telephone: 775-324-7078

25        maryfrudden@sbcglobal.net

26        On Behalf of Themselves and their Minor Children

27

28

1

## CERTIFICATE OF SERVICE

2

3        I hereby certify that I hand-delivered a copy of the foregoing document to Defendants to

4    the following:

5    MAUPIN, COX & LeGOY
     4785 Caughlin Parkway
6    Reno, NV 89519

7    Dated this 23 day of November, 2011.

8                                                    Mary Frudden

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28