1
2
3
4
5
6
7
8
9
10
11
12
13

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

MARY FRUDDEN et al.,                              )
                                                 )
                    Plaintiffs,                  )
                                                 )          3:11-cv-00474-RCJ-VPC
        vs.                                      )
                                                 )
KAYANN PILLING et al.,                           )          **ORDER**
                                                 )
                    Defendants.                  )
_____            )

14      This case arises out of the adoption of a school dress code at a public elementary school.

15 Defendants have moved to dismiss for failure to state a claim.  For the reasons given herein, the

16 Court grants the motion.

17 **I.      FACTS AND PROCEDURAL HISTORY**

18      Pro se Plaintiffs Mary and John E. Frudden are the parents of two minor children (the

19 "Children") who attend Roy Gomm Elementary School ("RGES") in Reno, Nevada. (Compl.

20 ¶¶ 4–5, Oct. 18, 2011, ECF No. 3).  The RGES Parent Faculty Association, Inc. ("PFA") is a

21 non-profit fundraising organization with no statutory authority to make rules or regulations

22 affecting RGES students. (*Id.* ¶¶ 17–18).  Nevertheless, at a January 19, 2010 PFA meeting, PFA

23 President Mimi Butler asked the attendees about their interest in school uniforms, although

24 nothing concerning a dress code was listed on the agenda. (*Id.* ¶¶ 19, 21).  At the March 16, 2010

25 PFA meeting, the dress code did appear on the agenda, though the agenda was not distributed

prior to the meeting. (*Id.* ¶ 26).  An April 2010 issue of the RGES newspaper, the Gopher

Gazette, noted that the PFA was recommending adoption of school uniforms for the 2010–2011

school year. (*Id.* ¶ 29).  At an April 13, 2010 PFA meeting, Butler noted that in order for the

adoption of school uniforms to pass, two-thirds of the ballots returned would have to be in

support, and all families would have to vote. (*Id.* ¶ 32).  The ballots were sent home with

students, and each family was entitled to one vote regardless of the number of children it had at

RGES. (*Id.* ¶¶ 35–36).  The ballots were not confidential, and no safeguards were used to ensure

parents received the ballots or that parents actually cast the votes, as opposed to students. (*Id.*

¶¶ 39–40).  The May 2010 Gopher Gazette reported the results as 62% in favor of the dress code,

which was not enough for the measure to pass. (*Id.* ¶ 42).  At the May 18, 2010 PFA meeting,

Butler reported the defeat of the measure and noted the PFA would try again the following year.

(*Id.* ¶ 47).

At a PFA meeting on February 11, 2011, RGES Principal KayAnn Pilling appointed a

uniform committee (the "Committee") to gather information and educate parents about the

proposed dress code. (*Id.* ¶¶ 49–51).  At the March 2011 PFA meeting, Butler reported that a

parent information night and fashion show would be held on April 26, 2011, and the April 2011

Gopher Gazette contained the same announcement. (*Id.* ¶¶ 58–59).  Parents had no meaningful

opportunity to submit opposing data or argument at the April 26, 2011 meeting. (*Id.* ¶ 63).  On

April 27, 2011, Plaintiff Mary Frudden requested certain information by email from Defendant

Dina Hunsberger, the chairwoman of the Committee and Vice President of the PFA. (*Id.* ¶ 82).

Later that day, Frudden sent an email to Hunsberger, Pilling, and Washoe County School District

("WCSD") Superintendent Heath Morrison asserting that the school had no authority to adopt a

dress code and that the action was unconstitutional. (*Id.* ¶ 83).  The May 2011 Gopher Gazette,

published on April 29, 2011, noted that ballots had to be returned by May 2, 2011. (*Id.* ¶ 89).  As

with the previous ballots, the ballots were not confidential, and no safeguards were used to

1   ensure parents received the ballots or that parents actually cast the votes, as opposed to the

2   students. (*Id.* ¶¶ 92–93, 96). Some ballots were sent home with students, but some were handed

3   out at the April 26, 2011 meeting. (*Id.* ¶¶ 94–95).

4          On May 8, 2011, Pilling announced via "connect-ed" that over 70% of families had

5   returned their ballots and 66% of families had voted in favor of uniforms, so uniforms would be

6   required the following year. (*Id.* ¶ 103). On May 9, 2011, Frudden emailed Hunsberger to

7   determine when the ballots would be available for review. (*Id.* ¶ 106). After several more

8   attempts to contact Hunsberger and others, and after being directed to Pilling and others, (*see id.*

9   ¶¶ 107–26), Pilling eventually sent Frudden the ballot report and vote summary to Frudden by

10  email on May 16, 2011, (*id.* ¶ 127). The vote summary did not indicate how many ballots were

11  issued and returned, but only that 70% of families voted, and it noted that three late "yes" votes

12  were not counted. (*Id.* ¶ 128). The summary indicated that 183 of the 276 votes cast were cast in

13  favor of uniforms. (*Id.* ¶ 129). Although Plaintiffs do not point it out, 183 of 276 is 66.3%,

14  which is less than two-thirds.[1] Two-thirds of 276 is exactly 184, so although Plaintiffs

15  emphasize that one single fewer vote would have resulted in the measure failing under the two-

16  thirds requirement, (*see id.* ¶ 130), the measure in fact failed to pass under the two-thirds

17  requirement according to Pilling's own records.

18         On May 31, 2011, RGES sent home a pre-order form, to the back of which was attached

19  the written uniform policy (the "Policy"). (*Id.* ¶¶ 144–46). On June 2, 2011, Frudden and two

20  other parents of RGES students met with Defendant WCSD Area Superintendent Lynn Rauh.

21  (*Id.* ¶ 148). Frudden asked Rauh what authority an individual school had to implement a

22  uniform policy, and Rauh stated there was no written authority and that Rauh had the ability to

23  prevent the Policy from being acted upon but would not make a decision at that time. (*Id.*

24  ──────────────

25         [1]As a decimal, two-thirds is written as 0.6, with a horizontal bar over the decimal to
    indicate that the six repeats forever, i.e., 0.66666, etc. 66% is less than two-thirds, as is 66.3%.

¶¶ 150–52).  On June 6, 2011, Frudden delivered to the WCSD Board of Trustees, Morrison, Rauh, Pilling, and WCSD Attorney Chris Reich a request to declare the Policy void or to revoke it. (*Id.* ¶ 154).  No party responded to this request. (*Id.* ¶ 161).

Plaintiffs sued Pilling, Hunsberger, Morrison, Rauh, Reich, the Committee, and WCSD in this Court on eighteen causes of action.  The First Amended Complaint ("FAC") omits Reich as a Defendant and lists sixteen causes of action: (1) Declaratory Judgment that the Committee and RGES had no power to enact the Policy under Nevada Revised Statutes ("NRS") section 392.458; (2) violation of the Children's First Amendment rights pursuant to 42 U.S.C. § 1983 due to the requirement to wear particular clothing; (3) violation of associational rights between Plaintiffs and the Children pursuant to § 1983; (4) Procedural and Substantive Due Process violations pursuant to § 1983; (5) violation of Substantive Due Process pursuant to § 1983; (6) Failure to Train and Supervise pursuant to § 1983; (7) violation of the Equal Protection Clause pursuant to § 1983; (8) violation of Plaintiffs' First Amendment rights pursuant to § 1983 due to RGES's viewpoint discrimination in the unequal use of facilities as between supporters and opponents of the Policy; (9) Violation of NRS section 392.4644; (10) Declaratory Judgment of the violation of open meetings laws under NRS Chapter 241; (11) "Breach of Special Relationship"; (12) Intentional and Negligent Misrepresentation; (15) Declaratory Judgment of the violation of access to public records laws under NRS Chapter 239; (14) Attorney's Fees and Costs under § 1988; (15) Injunctive Relief; and (16) Declaratory Relief.  Defendants have moved to dismiss for failure to state a claim.

## II.   LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action

that fails to state a claim upon which relief can be granted.  A motion to dismiss under Rule 12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  When considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).  The court, however, is not required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A formulaic recitation of a cause of action with conclusory allegations is not sufficient; a plaintiff must plead facts showing that a violation is plausible, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.  However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citation omitted).  Similarly, "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss" without converting the motion to dismiss into a motion for summary judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  Moreover, under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  Otherwise, if the district court considers materials outside of the pleadings, the motion to dismiss is converted into a motion for

1    summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th

2    Cir. 2001).

3    **III.    ANALYSIS**

4        **A.    Declaratory Judgment Under NRS Section 392.458**

5        Plaintiffs entitle this claim "Without Power to Enact," and it appears to be based upon

6    NRS section 392.458, which governs the adoption of school uniform policies.  The claim is

7    therefore best characterized as one for declaratory judgment.  Section 392.458 provides:

8            The board of trustees of a school district may, in consultation with the
        schools within the district, parents and legal guardians of pupils who are enrolled in
9        the district, and associations and organizations representing licensed educational
        personnel within the district, establish a policy that requires pupils to wear school
10       uniforms.

11   Nev. Rev. Stat. § 392.458(1).  Plaintiffs ask the Court to declare that the Policy is invalid

12   because the Committee, PFA, and RGES had no power to enact it, but that only the board of

13   trustees of the WCSD had such authority.  On its face, the statute is permissive, not restrictive,

14   and it does not appear to divest individual schools of any authority they already had to

15   implement a uniform policy.  It simply permits school districts to establish uniform policies

16   directly, settling any potential dispute between school districts desiring to impose uniforms and

17   individual schools that dissent.

18       Section 392.458 was added to the Nevada Revised Statutes in 1997 as part of Assembly

19   Bill 376 ("AB 376"). *See* 1997 Nev. Stat. ch. 522, sec. 18, 2488.  Assemblywoman Giunchigliani

20   sponsored AB 376.  The first hearing was in the Assembly Education Committee on June 2,

21   1997.  At that hearing, Assemblywoman Cegavske opined that enforcement would be next to

22   impossible. *See* Ass. Comm. Educ. Mins., June 2, 1997, *available at*

23   http://www.leg.state.nv.us/Session/69th1997/97minutes/AM/ED/am6-02ED.htm.  Later, a minor

24   student testified that she opposed school uniforms on the basis of her right to expression. *See id.*

25   Assemblywoman Von Tobel spoke in favor of school uniforms because it would help prevent

gang affiliation. *See id.*  Chairman Williams appointed Assemblyman Hickey as chairman of a subcommittee to address the issues raised concerning AB 376 at the June 2 hearing and appointed Assemblywomen Cegavske and Von Tobel as members of the subcommittee. *See id.*

The subcommittee first met on June 17, 1997. *See* Ass. Subcomm. Educ. Mins., June 17, 1997, *available at* http://www.leg.state.nv.us/Session/69th1997/97minutes/AM/ED/ am6-17ED.htm.  Assemblywoman Giunchigliani, who was present as a guest legislator, opined that she had previously opposed school uniforms but had changed her position; she now believed school uniforms would make policing student dress easier because of clear standards, whereas broad standards of dress only led to increased debate in grey areas, and teachers and administrators had a difficult enough job without wasting time on hair-splitting debates over student dress. *See id.*  Assemblywoman Cegavske argued that the Clark County School District didn't think a school uniform would be appropriate unless teachers had to wear the same uniform, but after some debate with Assemblywoman Giunchigliani, she agreed with a provision permitting school districts to adopt dress codes but not mandating them to do so. *See id.*  The subcommittee met again on June 19, at which Assemblywoman Cegavske's motion to amend the word "shall" to "may" passed. *See* Ass. Subcomm. Educ. Mins., June 19, 1997, *available at* http://www.leg.state.nv.us/Session/69th1997/97minutes/AM/ED/am6-19EDsub.htm.

The full committee met again on June 23. *See* Ass. Comm. Educ. Mins., June 23, 1997, *available at* http://www.leg.state.nv.us/Session/69th1997/97minutes/AM/ED/am6-23ED.htm. Assemblywoman Cegavske suggested a further amendment, which the subcommittee had failed to address, permitting school districts to also adopt uniforms for teachers and support staff. *See id.*  All amendments passed. *See id.*  Before passage, however, there was additional debate concerning physical education uniforms. *See id.*  Specifically, "Mr. Manendo asked if the amendments meant each individual school would no longer have their own physical education uniforms.  Ms. Von Tobel stated it was simply enabling language but it would promote a generic

physical education uniform throughout each school district." *Id.* Although raised in the particular context of physical education uniforms, this exchange indicates that there was no intent to strip schools of whatever ability they already had to adopt uniforms in the absence of action by the school district. The legislature apparently had no objection to the longstanding practice of schools adopting their own uniforms in the physical education context, though one could presumably make similar First Amendment-based objections to such uniforms.

AB 376 passed the Assembly Ways and Means Committee on July 2. *See* Ass. Ways & means Comm. Mins., July 2, 1997, *available at* http://www.leg.state.nv.us/Session/69th1997/ 97minutes/AM/WM/am7-02WM.htm. The Senate Finance Committee passed AB 376 on July 7, after adopting amendment no. 1280. *See* Sen. Fin. Comm. Mins., July 7, 1997, *available at* http://www.leg.state.nv.us/Session/69th1997/97minutes/SM/FI/sm7-07FIfl-1.htm. Amendment no. 1280 deleted some sections of AB 376 and amended some lines concerning promotion of students from middle school to high school, but it did not affect the school uniform provisions. *See* Sen. Journal, July 7, 1997, *available at* http://www.leg.state.nv.us/Session/69th1997/97bills/ reports/Journal/sj169.htm. The Governor signed AB 376 on July 16. *See* History of AB 376, http://www.leg.state.nv.us/Session/69th1997/tracking/Detail.cfm?dbo_in_intro__introid=806.

In conclusion, Plaintiffs base the present claim on their contention that section 392.458 prevents individual schools from adopting uniforms. Section 392.458 does not on its face restrict the ability of an individual school to adopt a school uniform policy, nor does the legislative history indicate that this was the intent of the legislature in adopting the statute, which the legislators repeatedly referred to in committee as an "enabling" law. Nor do Plaintiffs plausibly allege that individual schools in Nevada are generally without authority to adopt uniform regulations. In the absence of a statute or constitutional provision, "public education in our Nation is committed to the control of state *and local* authorities." *Goss v. Lopez*, 419 U.S. 565, 678 (1975) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)) (emphasis added).

1   The Court is inclined to dismiss this claim, but because there are novel issues of state law, the

2   Court declines jurisdiction over this claim under 28 U.S.C. § 1367(c)(1).

3            **B.      The Children's First Amendment Expressive Rights**

4            The Ninth Circuit recently issued an opinion rejecting a school-uniform challenge to the

5   Clark County School District's ("CCSD") uniform policy. *See Jacobs v. Clark Cnty. Sch. Dist.*,

6   526 F.3d 419 (9th Cir. 2008).  In addressing a First Amendment challenge to the dress code in

7   that case, the court ruled that the proper standard for a viewpoint- and content-neutral dress code

8   is intermediate scrutiny: (1) the code must further an important or substantial government

9   interest; (2) the governmental interest must be unrelated to the suppression of free expression;

10  and (3) the incidental restriction on alleged First Amendment freedoms must be no greater than

11  is essential to the furtherance of that interest. *See id.* at 434.  First, the court found that CCSD

12  had important interests in increasing student achievement, promoting safety, and enhancing a

13  positive school environment, and that these were its actual motivations. *See id.* at 435–36.

14  Second, the court found that these interests were unrelated to the suppression of free expression,

15  because although the result would be less expression, it was not the district's goal or desire to

16  suppress expression, but rather the reduction in expression was merely a byproduct of achieving

17  its other important interests. *See id.* at 436–37.  Third, the court found that the uniform policy did

18  not restrict more speech than was necessary because it left open ample alternative channels of

19  expression, i.e., students were still free to socialize, publish articles in the school newspaper, and

20  participate in extra-curricular activities. *See id.* at 437 (quoting *Colacurcio v. City of Kent*, 163

21  F.3d 545, 551 (9th Cir. 1998)).  The court also rejected the argument that the uniform policy

22  compelled student expression, i.e., support for uniformity, because where all students were

23  required to wear the uniform, there was no risk that an observer would believe a student wore his

24  uniform as a personal showing of support for uniformity. *Id.* at 437–38.

25           Here, Plaintiffs allege that the Policy amounts to compelled speech, because the RGES

logo appearing on the clothing ("one team, one community") is an expressive statement that is not viewpoint-neutral, and that the very fact of wearing a uniform compels the expression of support for group affiliation. (*See* First Am. Compl. ¶ 148, Oct. 18, 2011, ECF No. 3).  Plaintiffs allege that there are no discipline or other problems at RGES justifying the Policy. (*See id.* ¶¶ 150–53).  They allege that there is no important governmental interest furthered by the Policy and that even if there were the Policy is more restrictive of speech than is essential to furtherance of those interests. (*See id.* ¶¶ 159–60).

Although the school logo of "one team, one community" on the uniforms in this case presents a slightly more complex question of compelled-speech and whether the policy is viewpoint- and content-neutral, the Court finds that the distinction is not substantial enough to indicate a First Amendment violation.  And there is in fact no real distinction.  The students in *Jacobs* wished to wear shirts with religious messages and were prohibited from doing so by the dress code. *See Jacobs v. Clark Cnty. Sch. Dist.*, 373 F. Supp. 2d 1162, 1172 (D. Nev. 2005).  The impingement on the students' First Amendment rights in *Jacobs* was significantly greater than that alleged in this case, which consists of being forced to wear a uniform with an innocuous school motto and a picture of a gopher.  There is no meaningful risk that a bystander would think any of the hundreds of identically dressed young children on the grounds of an elementary school individually chose the motto and/or mascot appearing on their uniforms. *See Jacobs*, 526 F.3d at 437–38.  The Court dismisses this claim.

**C.     The Children's and Plaintiffs' First Amendment Associational Rights**

Plaintiffs allege that the Policy violates their parental liberty interest in the "companionship, care, custody, and management" of their children. (*See* First Am. Compl. ¶¶ 177–83).  "The Supreme Court has held that the right of parents to make decisions concerning the care, custody, and control of their children is a fundamental liberty interest protected by the Due Process Clause." *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1204 (9th Cir. 2005) (citing

1   *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion)).  "[T]he state 'as parens patriae'

2   may restrict parents' interest in the custody, care, and nurture of their children 'by requiring

3   school attendance, regulating or prohibiting the child's labor and in many other ways.'" *Id.*

4   (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)).  The Fifth Circuit has upheld a

5   school uniform policy against a claim of the right to parental control. *See Littlefield v. Forney*

6   *Indep. Sch. Dist.*, 268 F.3d 275, 290–91 (5th Cir. 2001) (noting that a school uniform policy need

7   only pass rational-basis review to survive a parental-control challenge).  It cannot be said that

8   there is no rational relationship between the legitimate governmental interest of student

9   discipline and the enforcement of a school uniform policy, because it is reasonable to think that

10   enforcement of a dress code will inculcate discipline in children.  The Court dismisses this claim.

11         **D.    Procedural and Substantive Due Process**

12         The Ninth Circuit held in *Jacobs* that the failure of a school or a school district to follow

13   the procedures outlined in its own regulations, e.g., by failing to achieve the requisite level of

14   parental approval, does not implicate the Due Process Clause of the Fourteenth Amendment. *See*

15   *Jacobs*, 526 F.3d at 441 & n.47.  Defendants' failure to reach the requisite two-thirds approval of

16   parents under their own rules is therefore no basis for a due process challenge.  Failure to follow

17   a local regulation may incidentally constitute a procedural due process violation where a

18   procedure mandated by the local regulation is required by the Due Process Clause even in the

19   regulation's absence, *see id.* at 441 n.48, but Plaintiffs make no such allegation here.

20         Plaintiffs also allege a substantive due process violation.  A separate substantive due

21   process claim under § 1983 is only available where no specific right under the Bill of Rights,

22   such as the First Amendment right to free speech, fairly applies to the facts of the claim. *Koutnik*

23   *v. Brown*, 456 F.3d 777, 781 (7th Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 395

24   (1989)).  In the present case, the First Amendment fairly applies to the facts of the claim, so a

25   substantive due process claim is unavailable.

1    **E.**      **Substantive Due Process**

2         Entitled "Policy of Inaction," the fifth claim appears to constitute another substantive due

3    process claim.  Under this claim, Plaintiffs repeat their contentions that RGES, the PFA, and the

4    Committee had no authority to enact the dress code. (*See* First Am. Compl. ¶ 203).  Plaintiffs

5    also allege that "WCSD has a custom and practice of inaction thereby allowing associations

6    without authority . . . to implement mandatory school uniform policies . . . in an arbitrary and

7    capricious manner with no procedural safeguards." (*See id.* ¶ 205).  This allegation, if true, tends

8    to support the notion that individual schools have the authority to implement dress codes

9    independently of section 392.458, which, as discussed *supra*, concerns a school district's ability

10   to impose uniforms on non-consenting schools.  Plaintiffs allege this policy "amounts to a failure

11   to protect the constitutional rights of Plaintiff parents . . . ." (*See id.* ¶ 206).

12        Again, there is no substantive due process claim.  Perhaps this claim is meant to

13   constitute a *Monell*-type claim against WCSD based upon a failure of WCSD to prevent the

14   alleged violations.  But Plaintiffs do not allege that WCSD has a custom and practice of

15   permitting First Amendment violations.  They allege only a custom and practice of due process

16   violations, and as discussed, *supra*, no due process claims lie in this case.  The Court dismisses

17   this claim.

18   **F.**      **Failure to Train and Supervise**

19        Plaintiffs allege that WCSD failed to train and supervise RGES employees concerning

20   proper school uniform policies, and that this failure led to the imposition of a policy at RGES

21   that violates Plaintiffs' rights.  A *Monell*-type failure-to-train-and-supervise claim is not

22   plausible in this case, because the constitutional claims themselves fail.

23        A government entity may not be held liable under 42 U.S.C. § 1983, unless
     a policy, practice, or custom of the entity can be shown to be a moving force behind
24   a violation of constitutional rights. *Monell v. Dep't of Soc. Servs. of the City of N.Y.*,
     436 U.S. 658, 694 (1978). In order to establish liability for governmental entities
25   under *Monell*, a plaintiff must prove "(1) that [the plaintiff] possessed a

constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997) (internal quotation marks and citation omitted; alterations in original).

> Failure to train may amount to a policy of "deliberate indifference," if the need to train was obvious and the failure to do so made a violation of constitutional rights likely. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). Similarly, a failure to supervise that is "sufficiently inadequate" may amount to "deliberate indifference." *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989). Mere negligence in training or supervision, however, does not give rise to a *Monell* claim. *Id.*

*Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (alterations in original).

If there were a First Amendment violation via the Policy, and if the need to train school employees on First Amendment limitations of school uniform policies was obvious because a violation would be likely without such training, it would be plausible that the alleged violations here came about due to WCSD's failure to train RGES employees on the constitutional limits of school uniform policies, as Plaintiffs allege. (*See id.* ¶¶ 213–18). However, even if the First Amendment claims survived, and even assuming a failure to train in this case, the Court could not say that the failure to train RGES employees on the First Amendment limitations of school uniform policies made a violation likely or even that the need for training was obvious. The Ninth Circuit had recently upheld CCSD's school uniform policy against First Amendment and other challenges in *Jacobs*, and WCSD therefore had no indication that First Amendment training would be necessary to avoid the violations alleged in this case, much less that First Amendment violations would be likely absent such training. The Court dismisses this claim.

### G.    Equal Protection Clause

Plaintiffs allege that the Policy violates the Equal Protection Clause of the Fourteenth Amendment because not all schools within WCSD have uniform policies. (*See id.* ¶ 228). But it is not WCSD that imposed the Policy on RGES. RGES adopted the Policy for itself, and

1    Plaintiffs do not allege that the Policy applies to their Children unequally with respect to other

2    children at RGES.  Plaintiffs' arguments that RGES was without authority to adopt the Policy

3    are addressed elsewhere.  The Court dismisses this claim.

4    **H.**    **RGES's Viewpoint Discrimination in Enacting the Policy**

5           The Supreme Court uses a "forum based" approach for judging the constitutionality of

6    restrictions on free speech. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678

7    (1992).  A traditional public forum ("TPF") is one where speech is traditionally permitted on

8    governmental property. *Id.*  A governmental entity may not regulate speech within such a forum

9    unless the regulation is "narrowly drawn to achieve a compelling state interest." *Id.*  A

10   designated public forum ("DPF") is one that a governmental entity may leave closed, because it

11   is not the kind of forum traditionally open to the public, but which the government has in fact

12   opened for speech. *Id.*  While open, an DPF "is subject to the same limitations" as a TPF. *Id.*  A

13   limited public forum ("LPF") "is a sub-category of a designated public forum that 'refer[s] to a

14   type of nonpublic forum that the government has intentionally opened to certain groups or to

15   certain topics.'" *Hopper v. City of Pasco*, 241 F.3d 1067, 1074 (9th Cir. 2001) (quoting *DiLoreto*

16   *v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 965 (9th Cir. 1999)) (alteration in

17   original).  All other public property constitutes a non-public forum ("NPF") that the government

18   has left closed, and regulation of a NPF "need only be reasonable, as long as the regulation is not

19   an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Id.* at

20   678–79.

21          Plaintiffs allege that RGES violated the First Amendment by failing to provide opponents

22   of the Policy equal access to a LPF it opened during the debate over the Policy.  For example,

23   Defendants permitted the PFA to use school supplies, copy machines, computers, and school

24   staff in order to advance the pro-uniform position, but they denied opponents of the uniforms

25   access to these facilities. (*Id.* ¶¶ 247–48).  Plaintiffs argue that this amounted to impermissible

1  viewpoint discrimination within a LPF without a compelling governmental interest. (*See id.*
2  ¶¶ 249–52).

3      The Court must first determine the nature of RGES facilities Plaintiffs identify.  It is clear
4  that access to staff labor, supplies, and equipment at a public school is not a TPF, because the
5  public may not traditionally appropriate such resources for expression of speech.  Access to
6  these facilities was either a LPF or a NPF, depending on whether RGES in fact opened the forum
7  to parents for the purpose of expressing opinion on the uniform issue.  Furthermore, if RGES
8  simply accepted the PFA's donated manpower in order to further RGES's own pro-uniform
9  position, the forum analysis might not apply at all. *See Pleasant Grove City, Utah v. Summum*,
10  555 U.S. 460, 467 (2009) ( "If [the government was] engaging in [its] own expressive conduct,
11  then the Free Speech Clause has no application.  The Free Speech Clause restricts government
12  regulation of private speech; it does not regulate government speech.").  In *Summum*, Pleasant
13  Grove City, Utah had accepted the private donation of a monument of the Ten Commandments
14  for permanent display in a public park.  The city, however, denied the request of another private
15  group to donate a monument of the Seven Aphorisms of Summum for permanent display in the
16  same park.  The Court ruled that the usual forum analysis did not apply, because acceptance or
17  denial of a privately donated monument for indefinite display on government property
18  constitutes direct government speech not subject to the Free Speech Clause. *Id.* at 467–68 ("A
19  government entity may exercise . . . freedom to express its views when it receives assistance
20  from private sources for the purpose of delivering a government-controlled message.").
21  Therefore, if RGES permitted the PFA to use its facilities in order to further RGES's own
22  speech, i.e., support for the Policy, then its actions may be unobjectionable under *Summum*.

23      The Court finds that *Summum* probably applies in the present context.  Moreover, it does
24  not appear the Court opened any public forum with respect to its office supplies and equipment,
25  even under a traditional forum analysis.  The *Summum* Court noted that the determination of

1   whether the typical forum analysis should be ignored in favor of a finding of direct government

2   speech is context-dependent. *See id.* at 470 ("There may be situations in which it is difficult to

3   tell whether a government entity is speaking on its own behalf or is providing a forum for private

4   speech, but this case does not present such a situation.  Permanent monuments displayed on

5   public property typically represent government speech.").  The *Summum* Court also recognized

6   "the legitimate concern that the government speech doctrine not be used as a subterfuge for

7   favoring certain private speakers over others based on viewpoint." *Id.* at 473.  Even if *Summum*

8   did not apply here, however, Plaintiffs do not sufficiently allege that RGES opened a LPF.  It

9   appears that RGES simply used its own resources, and allowed its allies to use them while

10  maintaining total control over who could use them and for what purpose, to support its own

11  position on the school uniform proposal.  This is not a case of government endorsement of a

12  religious message, a special category of speech where government actors must remain silent

13  when speaking in an official capacity except for certain de minimis "ceremonial deism."  Rather,

14  the uniform policy was an area where the government was allowed freely to express its own

15  viewpoints without automatically and accidentally creating a DPF or LPF. *See, e.g.*, *Page v.*

16  *Lexington County School Dist. One*, 531 F.3d 275 (4th Cir. 2008).  The Court dismisses this

17  claim.

18      **I.      Declaratory Judgment as to Section 392.4644**

19      Section 392.4644 governs the adoption of disciplinary policies by school principals; the

20  statute contains substantive requirements, as well as procedural requirements for the adoption of

21  such policies:

22      1. The principal of each public school shall establish a plan to provide for the
        progressive discipline of pupils and on-site review of disciplinary decisions.  The
23      plan must:

24      (a) Be developed with the input and participation of teachers and other educational
        personnel and support personnel who are employed at the school, and the parents and
25      guardians of pupils who are enrolled in the school.

(b) Be consistent with the written rules of behavior prescribed in accordance with NRS 392.463.

(c) Include, without limitation, provisions designed to address the specific disciplinary needs and concerns of the school.

(d) Provide for the temporary removal of a pupil from a classroom in accordance with NRS 392.4645.

Nev. Rev. Stat. § 392.4644(1)(a)–(d).  Plaintiffs allege that the Policy conflicts with the statute, both in substance and in the way the Policy was adopted.

First, Plaintiffs argue that the Policy violates subsection 392.4644(1)(a) because it includes a discipline component and "was not developed with the input and participation of the parents and guardians of pupils who are enrolled in the school . . . ." (First Am. Compl. ¶ 262). Plaintiffs reproduce the Policy in the FAC. (*See id.* ¶ 89).  Article VI is entitled "Disciplinary Action" and provides for three progressive levels of discipline for uniform violations. (*See id.*). Plaintiffs allege that parents were never notified of any of the Committee meetings, and that there was only an informational meeting, to which parents were invited, but that they were not permitted to voice objections at that meeting. (*See id.* ¶¶ 46–56).  The only input parents were permitted was the actual vote.  Second, Plaintiffs argue that the Policy violates subsection 392.4644(1)(b) because it fails to incorporate anti-drug rules as required under section 392.463. (*See id.* ¶¶ 259–61, 264–65).  Third, Plaintiffs argue that the Policy violates subsection 392.4644(1)(c) because it does not address specific disciplinary needs. (*See id.* ¶ 263).

Defendants argue that the statute provides for no express or implied cause of action. They appear to be correct.  The statute creates no express cause of action.  Nevada permits causes of action to be implied from statutes:

Whether a private cause of action can be implied is a question of legislative intent. To ascertain the Legislature's intent in the absence of plain, clear language, we examine the entire statutory scheme, reason, and public policy.  In so doing, we are guided by three factors originally set forth by the U.S. Supreme Court: (1) whether the plaintiffs are of the class for whose special benefit the statute was enacted; (2) whether the legislative history indicates any intention to create or to deny a private

remedy; and (3) whether implying such a remedy is consistent with the underlying purposes of the legislative scheme.

*Baldonado v. Wynn Las Vegas, LLC*, 194 P.3d 96, 100–01 (Nev. 2008) (footnotes, alterations, and internal quotation marks omitted).  School officials, not parents, are those for whose special benefit the statute was enacted, and the legislative history indicates no intent to create a private right of action.  Section 392.4644 was added to the Nevada Revised Statutes in 1999 as part of Assembly Bill 521 ("AB 521"). *See* 1999 Nev. Stat. ch. 591, sec. 3, 3185.  The first hearing was in the Assembly Education Committee on April 5, 1999. *See* Ass. Educ. Comm. Mins., Apr. 5, 1999, *available at* http://www.leg.state.nv.us/Session/70th1999/Minutes/ AM-ED-990405-Meeting%2016.html.  The minutes of that hearing make it clear that the purpose of the bill was to strengthen the ability of schools to deal with problem students and not to force principals to solicit parent involvement in writing discipline codes. *See id.*  The many persons who testified at the hearing related "horror stories" of student discipline problems and did not express the position that discipline codes were sufficient except that parents were not involved in drafting them. *See id.*  The involvement of parents provided for in the statute is ancillary to the purpose of the statute.  The committee passed the bill. *See id.*  The Assembly Ways & Means and Senate Finance Committees then passed the bill, the bill passed both houses unanimously, and the Governor signed it on June 9, 1999. *See* AB 521 History, http://www.leg.state.nv.us/Session/ 70th1999/Reports/history.cfm?ID=2859.

Therefore, even assuming Plaintiffs are correct that the Policy and its adoption did not comply with section 392.4644, they have no private right of action to enforce such a grievance.  Nor can they rely on the declaratory judgment statutes.  Where there is no private right of action, there is no jurisdiction to entertain a request for a declaration under 28 U.S.C. § 2201; to hold otherwise would "evade the intent of [a legislature] not to create private rights of action under those statutes and would circumvent the discretion entrusted to the executive branch in deciding

how and when to enforce those statutes." *Jones v. Hobbs*, 745 F. Supp. 2d 886, 893 (E.D. Ark. 2010). "The availability of relief under the Declaratory Judgment Act 'presupposes the existence of a judicially remediable right.'" *Id.* at 892 (quoting *Schilling v. Rogers*, 363 U.S. 666, 677 (1960)). The Nevada Supreme Court has ruled similarly as to the state's declaratory judgment act. *See Builders Ass'n of N. Nev. v. City of Reno*, 776 P.2d 1234, 1234 (Nev. 1989) (affirming a district court's ruling that a state statute governing certain local fees did not create an implied cause of action and that the declaratory judgment act did not create jurisdiction where a private cause of action did not exist) ("The Uniform Declaratory Judgments Act does not establish a new cause of action or grant jurisdiction to the court when it would not otherwise exist."). The Court is inclined to dismiss this claim, but because there are novel issues of state law, the Court declines jurisdiction over this claim under 28 U.S.C. § 1367(c)(1).

### J.      Declaratory Judgment as to Chapter 241

Plaintiffs allege that the Policy violated the state open meeting laws under Chapter 241. A "public body" subject to the law is defined as:

> [a]ny administrative, advisory, executive or legislative body of the State or a local government which expends or disburses or is supported in whole or in part by tax revenue or which advises or makes recommendations to any entity which expends or disburses or is supported in whole or in part by tax revenue, including, but not limited to, any board, commission, committee, subcommittee or other subsidiary thereof . . . .

Nev. Rev. Stat. § 241.015(3)(a). "Action" under the law is "[a] decision made by a majority of the members present during a meeting of a public body." *Id.* § 241.015(1)(a). "Except as otherwise provided by specific statute, all meetings of public bodies must be open and public, and all persons must be permitted to attend any meeting of these public bodies." *Id.* § 241.020(1). "Except in an emergency, written notice of all meetings must be given at least 3 working days before the meeting." *Id.* § 241.020(2). The statute further describes the required form and content of notice. *See id.* § 241.020(2)–(8). Finally,

1
2
3
4

> Any person denied a right conferred by this chapter may sue in the district court of the district in which the public body ordinarily holds its meetings or in which the plaintiff resides.  A suit may seek to have an action taken by the public body declared void, to require compliance with or prevent violations of this chapter or to determine the applicability of this chapter to discussions or decisions of the public body.  The court may order payment of reasonable attorney's fees and court costs to a successful plaintiff in a suit brought under this subsection.

5   *Id.* § 241.037(2).

6   Plaintiffs have not sufficiently pled an open meeting law violation.  Defendants make two

7   arguments against this claim.  First, they argue that the Committee was not a "public body"

8   under the law.  The Court agrees.  The Nevada Supreme Court has not interpreted the meaning of

9   "public body," and the Court declines to apply this statute in the present context absent such

10   direction by the state appellate court.  Second, Defendants argue that because Plaintiffs ask the

11   Court to declare certain actions void, and because Plaintiffs did not commence the suit within

12   sixty days of final action, the Court should dismiss the claim.  *See id.* § 241.037(3).  Plaintiffs

13   filed the Complaint on July 6, 2011.  Therefore the action must have occurred on or after May 7,

14   2011 for the open meeting law claim to be timely.  Plaintiffs allege that Pilling announced the

15   passage of the Policy, i.e., the results of the election on May 8, 2011. (*See* First Am. Compl. ¶

16   69).  Even assuming the ballots were counted on or before May 7, 2011 and the Policy

17   technically adopted at that time, Plaintiffs should have the benefit of equitable tolling until the

18   moment they were informed the measure had passed.  Still, the PFA was not a public body under

19   the meaning of the statute.  The Court is inclined to dismiss this claim, but because there are

20   novel issues of state law, the Court declines jurisdiction over this claim under 28 U.S.C.

21   § 1367(c)(1).

22   **K.      Breach of Special Relationship**

23   Plaintiffs allege Defendants breached a special, fiduciary-like relationship with them, i.e.,

24   the special trust they put in Defendants to educate their children.  Nevada recognizes a claim for

25   constructive fraud, also referred to as a breach of confidence, which is similar to a breach of

fiduciary duty. *See Perry v. Jordan*, 900 P.2d 335, 946–47 (Nev. 1995).  But such claims arise

only in the context of special familial, professional, or social confidences not arising to a

technical fiduciary relationship.  A defendant must gain the confidence of a person in this way

and then fail to act in good faith for the person's best interests. *Id.* at 947.  The plaintiff in *Perry*

was a person with an eighth-grade education whose close friend and neighbor, who was a well-

educated businessperson, sold her a store for over one-third the fair market value and then

abandoned her promised management of the store. *See id.* at 336.  By contrast here, Plaintiff

simply disagrees with Defendants' judgment in the uniform matter.  Defendants are not alleged

to have tricked a vulnerable Plaintiff into voting for the uniforms, for example.  The Court

dismisses this claim.

### L.      Intentional and Negligent Misrepresentation

As Defendants note, Plaintiffs do not plausibly allege that they relied to their detriment

on any representations of any Defendant.  They complain mainly of failures to notify parents of

meetings and the like. (*See* First Am. Compl. ¶¶ 291–93).  They allege that Defendants

misrepresented their true reasons for adopting the Policy via the PowerPoint presentation they

gave at the April 26, 2011 meeting, (*see id.* ¶ 296), and that Defendants misrepresented their

roles and authority in adopting the Policy, (*see id.* ¶¶ 297–98).  The flaw in this claim is that the

only reliance alleged is the reliance of those parents who voted "yes," (*see id.* ¶ 307), but

Plaintiffs do not allege that they voted "yes."  In other words, they cannot be aggrieved under a

misrepresentation claim, because they did not rely on the alleged misrepresentations.  Plaintiffs'

claim that they relied is conclusory.  The non-conclusory facts alleged indicate that Plaintiffs did

not rely on Defendants' representations about the Policy but in fact vehemently opposed the

Policy.  The Court dismisses this claim.

### M.      Declaratory Judgment as to Chapter 239

Plaintiffs allege a violation of the right to access public records under Chapter 239.

Unlike the open meetings law, the public records law provides no private right of action.  As Defendants note, the appropriate remedy under Chapter 239 is a writ of mandamus pursuant to section 34.160. *See D.R. Partners v. Bd. of Cnty. Comm'rs*, 6 P.3d 465, 468 (Nev. 2000).  A federal district court's mandamus power extends only to officers of the United States. 28 U.S.C. § 1361; *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 469 (7th Cir. 1988).  The Court dismisses this claim.

**N.     Attorney's Fees and Costs Under § 1988, Injunctive and Declaratory Relief**

These are not independent claims in this case but are remedies depending on the success or failure of the other substantive claims.  The Court dismisses them as separate claims.

Finally, the motion for judicial notice is denied.  The information presented does not constitute evidence generally known in the state or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, *see* Fed. R. Evid. 201, but rather garden-variety documentary and photographic evidence.

///
///
///
///
///
///
///
///
///
///
///
///

**CONCLUSION**

IT IS HEREBY ORDERED that the Motion to Dismiss (ECF No. 7) is GRANTED.  The federal claims, the breach of special relationship claim, the misrepresentation claims, and the Chapter 239 claim are dismissed with prejudice.  Although the Court has expressed some cursory views on the Chapter 241 and Chapter 392 claims, because those claims raise novel issues of state law, the Court declines to exercise supplemental jurisdiction over them.

IT IS FURTHER ORDERED that the Motion for Judicial Notice (ECF No. 12) is DENIED.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

Dated this  31st day of January, 2012.

_____
ROBERT C. JONES
United States District Judge