UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

|  |  |
|---|---|
| JON E. FRUDDEN, ) ) Plaintiff, ) ) vs. ) ) KAYANN PILLING et al., ) ) Defendants. ) | 3:11-cv-00474-RCJ-VPC  **ORDER** |

This case arises out of the adoption of a school uniform at a public elementary school. Pending before the Court are Defendants' Motion for Summary Judgment (ECF No. 75), Plaintiff's Motion for Clarification (ECF No. 77), and Plaintiff's Motions to Strike (ECF Nos. 85, 89). For the reasons given herein, the Court grants the motion for summary judgment, addresses the motion for clarification, denies the first motion to strike, and grants the second motion to strike.

I.   **FACTS AND PROCEDURAL HISTORY**

Mary and John E. Frudden are the parents of two minor children ("John Doe" and "Jane Doe," collectively, the "Children") who attended Roy Gomm Elementary School ("RGES") in Reno, Nevada at relevant times, although John Doe has attended Swope Middle School ("SMS") since 2013. The RGES Parent Faculty Association, Inc. ("PFA") is a non-profit fundraising organization that adopted a school uniform policy (the "Policy") for RGES in conjunction with RGES in 2011. The Court will not repeat the details of the uniform adoption process as

recounted in previous orders, because those details are not relevant to the remaining claims in the case.

Plaintiffs sued Defendants in this Court on eighteen causes of action. The First Amended Complaint ("FAC") omitted one Defendant and listed sixteen causes of action: (1) declaratory judgment that the PFA and RGES had no power to enact the Policy under Nevada Revised Statutes ("NRS") section 392.458; (2) violation of the Children's First Amendment rights under 42 U.S.C. § 1983 due to the requirement to wear particular clothing; (3) violation of the Children's and Parents' associational rights under § 1983; (4) procedural and substantive due process violations under § 1983; (5) violation of substantive due process under § 1983; (6) failure to train and supervise under § 1983; (7) violation of the Equal Protection Clause under § 1983; (8) violation of Plaintiffs' First Amendment rights under § 1983 due to RGES's viewpoint discrimination in the unequal use of facilities as between supporters and opponents of the Policy; (9) violation of NRS section 392.4644; (10) declaratory judgment as to a violation of open meetings laws under NRS chapter 241; (11) "Breach of Special Relationship"; (12) intentional and negligent misrepresentation; (15) declaratory judgment as to a violation of public records laws under NRS chapter 239; (14) attorney's fees and costs under § 1988; (15) injunctive relief; and (16) declaratory relief.

Defendants moved to dismiss for failure to state a claim. The Court dismissed the federal claims and some of the state law claims but declined to exercise jurisdiction over other state law claims. Plaintiffs appealed. The Court of Appeals ruled that the mandatory display of the school motto (though not the bare fact of the uniforms themselves) and the content-based exception to the Policy permitting the wear of uniforms of nationally recognized youth organizations should be reviewed on remand under strict scrutiny. *See Frudden v. Pilling*, 742 F.3d 1199, 1207 (9th Cir. 2014).

After the mandate issued, the Court ordered Plaintiffs to file a second amended complaint, because the FAC was unclear as to the objected-to speech on the uniforms. Plaintiffs filed the Second Amended Complaint ("SAC"), and the Court denied a motion to strike it. Via the SAC, Mary Frudden withdrew as a plaintiff and appeared as her husband Jon Frudden's attorney. In response to Plaintiff's motion for clarification, the Court ruled that the only claim remaining for further proceedings was the First Amendment claim against the compelled wearing of the school motto on the uniforms and against the content-based exception for nationally recognized youth organizations. Any claims against the uniforms *per se* had been abandoned by failing to raise them in the opening brief on appeal, and in any case the issue had been conceded at oral argument on appeal. Plaintiff requested leave to amend the SAC. The Court denied the motion because the new claims Plaintiff proposed to add were variously *res judicata*, unripe, or futile.[1]

Defendants have moved for summary judgment. Plaintiff has opposed the motion and asked the Court to clarify the status of his claims relating to the uniform policy at SMS. Plaintiff has also asked the Court to strike five of Defendants' exhibits, three of which are attached to the motion for summary judgment and two of which are attached to the reply.

## II.   LEGAL STANDARDS

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *See Anderson*

---

[1] Plaintiff did not move to file a supplemental complaint based on the new allegations, and, although the Court did not note it at the time, because a supplemental complaint based on the new claims could have been the subject of a separate action, supplementation of the complaint would have been inappropriate for that reason alone, even if the new claims had been ripe and potentially meritorious. *See Planned Parenthood of S. Ariz. v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997).

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary judgment, a court uses a burden-shifting scheme:

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment

by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III.   ANALYSIS

#### A.   Motion for Summary Judgment

Defendants move for summary judgment on the following bases: (1) the prayer for injunctive relief is moot because, in accordance with WCSD Board Policy 5105, the RGES uniforms no longer contain any motto, and the previous content-based exception is not in force; (2) there was no violation because Defendants can satisfy strict scrutiny; and (3) the individual Defendants have qualified immunity.  Defendants also argue against damages and attorney's fees.

##### 1.   Mootness of the Prayer for Injunctive Relief

The parties appear to agree that the case is not moot as to past damages, but Defendants argue that the case is moot as to injunctive relief.  Plaintiff responds that the case is capable of repetition, yet evading review.  That is, Jane Doe still attends RGES, and RGES may in the future reestablish the offending policy or a similar policy.  The Court agrees with Defendants.  Although WCSD Board Policy 5105 permits schools to adopt uniforms, the uniforms may not— and these provisions were almost certainly adopted in response to this lawsuit—contain any

language on them except the school name, and there is a prohibition on content-based exceptions. (*See* WCSD Board Policy 5105 3–4, ECF No. 75, at 72).  There is therefore no "reasonable expectation" that Jane Doe will be subjected to the compelled wearing of the motto or the previous content-based exception, but only the mere possibility, which is not enough to invoke the exception to the mootness doctrine. *See Wiggins v. Rushen*, 760 F.2d 1009, 1011 (9th Cir. 1985) (Kennedy, J.).  Defendants are entitled to summary judgment as to injunctive relief.

    **2.**       **Qualified Immunity**

Even where there has been a constitutional violation, individuals are entitled to qualified immunity unless the state of the law at the time of the violation was clear enough that a reasonable person in the defendant's position would have known his actions violated the plaintiff's rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  A court has discretion to analyze the qualified immunity issue before addressing whether there was a violation. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'  We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (citation omitted; alterations in *Ashcroft*).  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

    The Court cannot find any clearly established right against the compelled wearing of a school motto on an elementary school uniform or against a uniform exception for nationally

recognized youth organizations on days when those organizations meet. The closest cases prohibit the compelled public display of a state motto on an automobile license plate, *Wooley v. Maynard*, 430 U.S. 705 (1977), and the compelled recitation of the Pledge of Allegiance in a public school, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943).

*Wooley* is not closely enough on point to put the constitutional question here beyond debate, because that case did not concern student speech in school, and the Supreme Court has noted that although the First Amendment protects students in school, *see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), the protections are not "coextensive with the rights of adults in other settings," *Morse v. Frederick*, 551 U.S. 393, 396–97 (2007) (quoting *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)) (internal quotation marks omitted). Indeed, in the school context, the Court of Appeals has gone so far as to approve a "heckler's veto" against the same kind of core political speech at issue in *Barnette* (whether to make a showing of allegiance to the nation), *see Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 776–78 (9th Cir. 2014) (en banc), a clear violation of First Amendment rights if applied to adults in the public sphere generally, *see Tinker*, 393 U.S. at 508 (citing *Terminiello v. City of Chicago*, 337 U.S. 1 (1949)). Furthermore, the Court of Appeals noted that "[o]n remand, the elementary school context may be relevant in weighing RGES's interest in including the motto on the uniform shirt." *Frudden*, 742 F.3d at 1205 n.3. Defendants were therefore not plainly incompetent in believing that it would be constitutionally acceptable to mandate that elementary school children wear a school motto on their uniforms while in school, or that the exception for nationally recognized youth organizations would violate the schoolchildren's rights.

Neither is *Barnette* directly on point, because that case involved compulsion of political speech, where protection under the First Amendment is at its zenith. *Meyer v. Grant*, 486 U.S.

414, 422 (1988).  The political speech at issue in *Barnette* was a compelled statement of allegiance to the nation and its flag, and refusal was punishable not only by instant expulsion of the child but by criminal prosecution of the child's parents. *See Barnette*, 319 U.S. at 629–33.  This case involves non-political speech.  The motto "Tomorrow's Leaders" indicates a belief that the students at RGES will grow up to be leaders in their communities.  The speech may or may not be objectionable to some, but it is not political in nature.  There is no compelled statement of allegiance to any nation, political party, or ideology, but only a statement of belief in the proposition that the students at RGES will grow up to be leaders in their communities, i.e., a claim of fact, as opposed to a statement of support or rejection of any policy.  The Court cannot say that Defendants were plainly incompetent for believing that the present case was distinguishable from *Barnette*.

Reasonable minds could have viewed this case as distinguishable from *Wooley* and *Barnette*, especially in light of *Morse* and *Dariano*, and there is therefore qualified immunity.  The Court finds that whether or not the decision to impose the mandatory motto and the exception for nationally recognized youth organizations was mistaken, it was reasonable.  The Court therefore grants qualified immunity to the individual Defendants.

The Court rejects Plaintiff's argument that Defendants have waived this defense by not pleading it in the Answer to the SAC.  Defendants' seventh affirmative defense is based on discretionary immunity, and even assuming that defense cannot be read to assert qualified immunity, the issue was previously preserved in a motion to dismiss.  Defendants may preserve affirmative defenses by raising them in motions so long as any delay does not prejudice a plaintiff. *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001).  In this case, there was necessarily no delay from Defendants' assertion of the qualified immunity defense in the motion to dismiss, because the defense was asserted within the time set to answer.

### 3. The Merits

The issue before the Court is whether there is a genuine issue of material fact that the motto and the content-based exception were "a narrowly tailored means of serving a compelling state interest." *Frudden*, 742 F.3d at 1207 (quoting *Rounds v. Or. State Bd. Of Higher Educ.*, 166 F.3d 1032, 1038 n.4 (9th Cir. 1999) (quoting *Pac. Gas & Elec. Co. v. Public Utils. Comm'n*, 475 U.S. 1, 19 (1986))) (internal quotation marks omitted).  Defendants argue that state governments have a compelling interest in eliminating discrimination in education, *Grutter v. Bollinger*, 539 U.S. 306, 331 (2004) (upholding a quasi-racial-quota admissions system), *superseded by state constitutional amendment*, and in maintaining an effective and efficient school system, *Ferrell v. Dallas Indep. Sch. Dist*, 392 F.2d 697, 703 (5th Cir. 1968) (upholding a ban on long hairstyles for boys).  Defendants misread *Grutter*.  The compelling interest found in that case was "the educational benefits that flow from a diverse student body," not eliminating discrimination. *See Grutter*, 539 U.S. at 328.  Contrary to Defendants' argument, the *Grutter* Court explicitly noted that remedying past discrimination was not compelling enough an interest to adopt a race-based admissions policy. *See id.* at 323–24 (citing *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 310 (1978)).  Anyway, Defendants do not argue either that there was any discrimination to be remedied at RGES in particular or in WCSD generally or that the uniform policy here increased the diversity of the RGES student body.  The Court of Appeals has cited *Ferrell* approvingly in finding no First Amendment violation in hair length restrictions on male students. *See King v. Saddleback Jr. Coll. Dist.*, 445 F.2d 932, 936–37 (9th Cir. 1971).  But that case is not closely on point.  It involved a dress code, not compelled speech on a uniform.  Still, other cases, *see infra*, support Defendants' position.

In support of their contention that the Policy was intended to serve compelling state interests, Defendants adduce the affidavits of former Principal Pilling and PFA members

indicating that the motto was included to ensure that students focused on their schoolwork rather than their clothing and to prevent bullying against students from lower socioeconomic stations.[2] Former PFA President Mimi Butler attests that the Policy was instituted to help increase test scores that had recently plateaued and thereby bring RGES from a good school to a great school, as well as to take students' attention off of differences in clothing quality, as many students at RGES were from wealthy families who could afford expensive clothing but many were not. (*See* Butler Aff. ¶¶ 3–6, ECF No. 75, at 37). Former PFA President, Vice President, and Chair of the PFA Uniform Committee Dina Hunsberger attests that the purposes of the Policy were to boost test scores and to prevent bullying against new students from less affluent families. (*See* Hunsberger Aff. ¶¶ 3–9, ECF No. 75, at 41). Former RGES Principal Kayann Pilling attests that the purposes of the Policy were to help students focus on their work, boost test scores, and prevent bullying against new students attending RGES under Title I, the WCSD's School Within a School ("SWAS") program, and the special education program. (*See* Pilling Aff. ¶¶ 3–10, ECF No. 75, at 50). As a Title I receiver school, RGES received students from other areas of the district, and the SWAS program was comprised of gifted students from throughout the district. (*See id.* ¶¶ 7–8). Title I and SWAS students at RGES came from all socioeconomic backgrounds, whereas many students assigned to RGES based on geography were from wealthy families (it is not clear whether any special education students were assigned to RGES based on considerations other than geography). (*See id.* ¶¶ 7–10).[3] Pilling therefore determined that

---

2 Plaintiff has alleged that the Policy was instituted for the purposes of creating an academic atmosphere, increasing peer respect, leveling the playing field, creating a greater sense of belonging, encouraging the idea that dressing for school is different than dressing for play, helping create school pride and school spirit, and establishing a culture of "one team, one community." (Second Am. Compl. ¶ 48, ECF No. 32). Defendants' present contentions are consistent with those allegations.

3 The Court takes judicial notice of the fact that RGES is located in a wealthy part of Reno.

uniforms would help to prevent bullying, because socioeconomic differences between students would no longer be so visually apparent. (*See id.* ¶ 10). The school logo and text was included on the shirts to ensure the same brand of shirt would be worn by all students, whereas a dress code requiring a generic polo shirt of a particular color would allow for differences in brands. (*See* Answers to Pls.' First Set of Interrogatories 9, ECF No. 75, at 98 (verified by Mimi Butler)). The purposes these witnesses attest to are listed in a letter (adduced by Plaintiff himself) written by then-PFA President Mimi Butler and sent to parents on May 3, 2010. The letter corroborates that the above-noted purposes were the actual purposes for the uniforms when their adoption was still being considered, not after-the-fact justifications. (*See* Letter, ECF No. 76-6 ("[s]chool uniforms help to create an academic atmosphere . . . [r]educe peer pressure and status based solely on one's clothing choices . . . [i]ncreased test scores")). A presentation (also adduced by Plaintiff himself) given to parents at an informational meeting before the uniforms were adopted for the 2011-2012 school year also confirms these purposes. (*See* Presentation, ECF No. 76-8). Defendants' answers to Plaintiff's interrogatories are not to the contrary.

      Defendants have satisfied their initial burden on summary judgment to present evidence that if uncontroverted at trial would entitle them to a directed verdict. They have presented evidence that the purposes of the Policy were to boost test scores and to prevent bullying of children from lower socioeconomic stations. The Court finds both purposes to be compelling, particularly the second. Children can of course be cruel to those who are different from them. In recent years, including in a case precipitating a lawsuit currently being litigated in this very District, bullying has even led to children committing suicide. Taking measures to prevent bullying, such as mandating uniform clothing to detract from socioeconomic differences, is therefore a compelling state interest. And Defendants have presented evidence that this was one of the primary purposes behind the Policy.

Defendants have also sufficiently shown that bullying or low test scores were "actual problems" for the purposes of a strict scrutiny analysis. Even if bullying had not yet manifested at RGES, Defendants were permitted to anticipate and take measures to prevent it, and there is an interest in maintaining or improving test scores even if they are not poor to begin with. *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 391–92 (6th Cir. 2005) ("[Plaintiffs] counter, the problems that the dress code seeks to address are not present at Highlands because it is already a high-achieving school with some of the top test scores in the State and the school has few discipline problems, episodes of clothing-based fights or safety concerns. This response has at least two flaws. For one, it addresses just some of the school district's interests while neglecting to mention the others. It says nothing at all, for example, about bridging socio-economic differences within a school district—which would always seem to be a sensible reason for a dress code and would invariably satisfy this modest requirement. For another, when a school district attains certain levels of achievement, it hardly means that it no longer has an interest in improving the educational environment further. In a world in which most people and institutions are either moving forward or backward, a school district cannot be faulted for searching for new ways to be excellent."). The Court of Appeals has cited *Blau* in approval in a school dress code case from this District and noted that "it is hard to think of a government interest more important than the interest in fostering conducive learning environments for our nation's children." *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 435–36 (9th Cir. 2008) (citing *id.*). Although the level of scrutiny in those cases was only intermediate, if the Court of Appeals would have difficulty thinking of a more important state interest, then the Court has little difficulty finding that interest to be compelling.

As to whether the Policy was narrowly tailored to serve Defendants' compelling purpose, the Court finds that it would be sufficiently difficult to avoid a child drawing inferences of

another child's socioeconomic background by other means if the children were permitted to wear clothing chosen and purchased by their parents that differed in quality (or at least in price) based on the brand. And it is no answer to argue that a child might learn of another child's socioeconomic background via other means. Clothing is a physical representation of that background that can present an immediately available and more tempting target for ridicule than generalized knowledge of another child's socioeconomic background.

In summary, the Court finds that Defendants have adduced evidence that the purposes behind the Policy were compelling and that the Policy was narrowly tailored to achieve them, such that Defendants would be entitled to a directed verdict if the evidence went uncontroverted at trial. Plaintiff has adduced no evidence tending to show that Defendants' purposes were not the actual purposes behind the adoption of the uniforms. As a preliminary matter, any of Plaintiff's exhibits authenticated only by Mary Frudden are inadmissible, because as an attorney in the case, she may not testify as to any disputed matter. *See DiMartino v. Eighth Jud. Dist. Ct. ex rel. Cnty. of Clark*, 66 P.3d 945, 946–47 (Nev. 2003) (citing former Sup. Ct. R. 178, now Nev. R. Prof. Conduct 3.7) ("[T]he lawyer may not appear in any situation requiring the lawyer to argue his own veracity to a court or other body, whether in a hearing on a preliminary motion, an appeal or other proceeding").[4] The only other affidavit or declaration adduced is that of Plaintiff, who attests as to the Children's experiences and as to communications from SWS, but not as to the communications from RGES, and he has authenticated none of the exhibits. (*See* Jon Frudden Decl. ECF No. 76-2). None of the exhibits are therefore properly authenticated. But even if they were, the Court does not find any of them to create a genuine issue of material fact in this case.

Plaintiff's Exhibit 1 is Defendant Pilling's answers to Plaintiff's first set of interrogatories. Nowhere therein is there any evidence that the purpose behind the Policy was

---

4 Nevada's ethical rules apply in this proceeding. *See* Local R. IA 10-7(a).

anything other than the compelling purposes to which Pilling and others have attested. Pilling answered that the reason for exempting the uniforms of youth organizations when those organizations would meet after school was to assist students and parents in planning and attending those meetings. The answers are sworn to by Pilling. Exhibit 2 is Jon Frudden's declaration. Exhibits 3–5 relate only to SMS. Exhibit 6 is the May 3, 2010 letter from Mimi Butler, which supports Defendants' position. Exhibit 7 is a flyer notifying parents of the April 26, 2011 "School Uniform Informational Parent Meeting" at RGES. Exhibit 8 is the PowerPoint presentation given at that meeting, which supports Defendants' position. Exhibit 9 is a letter that accompanied ballots to vote on the uniforms. It does not discuss the purposes for the uniforms. Exhibit 10 is a vote tally and comments submitted along with votes. Exhibit 11 is a newspaper or magazine article concerning school uniform policies. It is not adduced as an expert report and does nothing to negate Defendants' actual purposes. The article is therefore not helpful. Exhibit 12 is Defendant PFA's answers to Plaintiff's first set of interrogatories. Nowhere therein is there any evidence that the purpose behind the Policy was anything other than the compelling purposes to which Pilling, Butler, and Hunsberger have attested. The PFA (Mimi Butler) answered that the reason for permitting the uniforms of youth organizations when those organizations would meet after school was to assist students and parents in planning and attending those meetings. Exhibit 13 is a guide for implementing school uniforms. It is unhelpful for the same reason Exhibit 11 is unhelpful. Exhibit 14 is an issue of the Gopher Gazette indicating that changes were being made to the Policy as a result of the present lawsuit. The exhibit is not an admission that the Policy was unconstitutional and is otherwise unhelpful to the issues at hand. Exhibit 15 is Plaintiff's First Supplemental Disclosures. It is not sworn to by any person and does not include relevant evidence, in any case. Exhibit 16 consists of vote summaries as to uniforms at RGES and related correspondence. No evidence relevant to the strict scrutiny standard at issue is

included.  Exhibit 17 consists of email exchanges concerning the procedure whereby the Policy was adopted.  No evidence relevant to the strict scrutiny standard at issue is included, except for Mary Frudden's comments concerning why she believed uniforms were unnecessary.  Those comments are hearsay, and they are not adduced against a party declarant.  In any case, the Court has noted that under *Jacobs* and *Blau*, a school may address potential problems before they manifest for the purposes of an "actual problem" analysis.  Exhibit 18 consists of email exchanges concerning discipline against the Children.  The comments by Mary Frudden are hearsay and are not adduced against a party declarant.  It does not appear to be disputed that the children were punished for refusing to wear the uniform.  Exhibit 19 contains copies of "hate mail" received by the Fruddens concerning the present lawsuit.  The evidence is not relevant to the case.  Exhibit 20 includes more email exchanges, but nothing therein is relevant to the strict scrutiny issue.  Exhibit 21 is Mary Frudden's declaration.

In conclusion, the Court finds that the evidence adduced by the parties indicates that the purposes of the uniforms were, *inter alia*, to increase student performance by helping them to focus on their schoolwork and to detract from socioeconomic differences between students that varied clothing could highlight.  The Court finds these to be compelling state interests for the reasons given, *supra*.  Plaintiff has adduced no evidence indicating that these were not Defendants' actual purposes.  The Court finds that including the gopher mascot and the motto on the uniforms was narrowly tailored to serving the latter compelling purpose, because omitting those things could have permitted students to wear clothing of differing quality or price, thereby undermining one of the compelling purposes of adopting the uniform dress.  The Court notes that Defendants are not required to have used the least restrictive means of serving those purposes, but only "narrowly tailored" means, as noted by the Court of Appeals. *See Frudden*, 742 F.3d at 1207.  Defendants needn't have, for example, included the gopher and school name but not the

Case 3:11-cv-00474-RCJ-WGC   Document 90   Filed 02/10/15   Page 16 of 19

motto.  Although that might have been *more* narrowly tailored than the Policy was, the inclusion of the motto did not render the Policy constitutionally infirm for failure of narrow tailoring.  As the case law makes clear, First Amendment rights are not as extensive in the school context as in broader society. *Morse*, 551 U.S. at 396–97.  Political speech is the most closely protected speech, and the compelled speech at issue here was not political in nature.  The Policy was sufficiently narrowly tailored to serve the compelling purposes at issue to avoid a First Amendment violation.

The Court would also be inclined to find that the purpose behind permitting the wear of uniforms for nationally recognized youth organizations on days that those organizations met to have been compelling.  The evidence indicates that the purpose was to aid students and parents in attending those meetings with less disruption, i.e., without having to change clothes at the end of the school day in classrooms, school bathrooms, or parents' cars.  But the Court need not engage in that analysis, because it agrees with Defendants that there is no genuine issue of fact that the Children suffered no damages as a result of the previous content-based exemption.  Plaintiff does not even allege, much less provide evidence to show, that the Children had American Youth Soccer Organization ("AYSO") events after school on September 12 and 13, 2011 (the days they were punished for wearing the AYSO uniforms), but that they wore their AYSO uniforms on those days as a protest of the Policy generally, just as they had worn non-compliant clothing in protest from August 29, 2011 to September 11, 2011 and just as they thereafter wore their uniforms inside out with anti-uniform messages attached thereto on September 14, 2011. (*See* Second Am. Compl. ¶¶ 56–69).  Plaintiff does not allege or present evidence to show that the Children were ever punished for wearing their AYSO uniforms on days they had AYSO meetings based on the content of the shirts or the nature of the organization.  To the contrary, Plaintiff appears to affirmatively allege that the AYSO uniforms

fell within the exception for nationally recognized youth organizations. The AYSO uniforms simply happened to be the non-compliant clothing the Children chose to wear on September 12 and 13, 2011. In other words, Plaintiff does not allege or attempt to show that the Children's rights were violated because Defendants punished them due to the AYSO uniforms not being within the content-based exception, but only that their rights were violated because they wore AYSO uniforms rather than school uniforms on a day when there was no AYSO meeting or event.[5] That is no complaint against the content-based exception, but rather a garden-variety complaint against the uniforms generally, which the Court has addressed, *supra*. Plaintiff may not shoehorn the content-based exception issue into the broader uniform issue simply because the Children, on two of the many occasions when they violated the Policy generally, did so by wearing shirts that would have implicated the content-based exception in another context. The content-based exception is not alleged ever to have been directly implicated here, and Defendants are entitled to summary judgment as to that aspect of the claim.

    **4.**    **Punitive Damages**

Defendants next argue that punitive damages are not available in this case, because only municipalities remain as Defendants after the qualified immunity analysis, and punitive damages are not permitted against municipalities in § 1983 cases under *City of Newport v. Fact Concepts*, 453 U.S. 247 (1981). Defendants are correct, at least as to WCSD. *See Mitchell v. Dupnik*, 75 F.3d 517, 527 (9th Cir. 1996) (citing *id.* at 271). Plaintiff responds that he does not seek punitive damages against WCSD but that Defendants do not address the possibility of punitive damages against the PFA. This raises another issue. If Plaintiff wishes to maintain that punitive damages are available against the PFA, it can only be because the PFA is not a municipality under § 1983.

---

5 The FAC itself alleged that "Defendant Pilling informed Mary Frudden that in her opinion the exemption did not apply *because the Plaintiff students did not have a meeting that day and did not have practice that day*." (First. Am. Compl. ¶ 109, ECF No. 3 (emphasis added)).

But if it is true that the PFA is not a municipality for the purposes of § 1983, then the PFA is probably entitled to qualified immunity along with the other individual Defendants. Moreover, it may be the case that the PFA is not a proper party at all, but that its acts are wholly attributable to WCSD. *See Hervey v. Estes*, 65 F.3d 784, 792 (9th Cir. 1995). These issues are moot, however, because the Court grants summary judgment to Defendants.

        5.        **Compensatory Damages**

Defendants also argue that compensatory damages would be speculative in this case. The Court rejects this argument. The Court cannot say that there would be no compensable emotional or economic damages in this case if a violation could be shown. The issue is moot, however, because the Court grants summary judgment to Defendants.

        6.        **Attorney's Fees**

Finally, Defendants argue that Plaintiff cannot be awarded attorney's fees in this case because of his attorney's former status as a co-Plaintiff and her relationship to Plaintiff and the Children. Plaintiff argues that fees are allowed. The issue is unripe.

        B.        **Motion for Clarification**

There is no claim for trial against the uniform policy at SMS, which John Doe now attends. As noted, *supra*, such a claim would have to be brought via a separate action; there was no leave to amend to add such a claim in this case, and a supplemental claim would not be appropriate.

        C.        **Motions to Strike**

Plaintiff first asks the Court to strike the Butler, Pilling, and Hunsberger affidavits. The Court denies the motion. There is nothing redundant, immaterial, impertinent, or scandalous in those affidavits. *See* Fed. R. Civ. P. 12(f). The affiants have sworn that the affidavits are based on personal knowledge. (*See* Butler Aff. ¶ 1; Pilling Aff. ¶ 1; Hunsberger Aff. ¶ 1). That is

enough to make them admissible, Plaintiff's arguments to the contrary notwithstanding. Plaintiff also argues that the affidavits are inconsistent with prior statements made by those witnesses. The Court does not weigh credibility at the summary judgment stage, however, and finds no inconsistency in any case.

Plaintiff next asks the Court to strike the affidavit of George Brown (Exhibit 1), and a letter from SMS to parents (Exhibit 1a), both of which are attached to Defendants' reply, under Rule 37(c)(1) for failure to identify him as a witness under Rule 26(a). The Court grants the motion, not for failure to disclose, but because the evidence relates only to SMS and is therefore impertinent to the claims in the case. *See* Fed. R. Civ. P. 12(f).

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Summary Judgment (ECF No. 75) is GRANTED.

IT IS FURTHER ORDERED that the Motion for Clarification (ECF No. 77) is ADDRESSED, *supra*.

IT IS FURTHER ORDERED that the Motion to Strike (ECF No. 85) is DENIED.

IT IS FURTHER ORDERED that the Motion to Strike (ECF No. 89) is GRANTED.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

Dated this 10th day of February, 2015.

_____
ROBERT C. JONES
United States District Judge